**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 8, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

WILLIAM JOHN YEHLING,

Defendant - Appellant.

No. 05-1416

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 99-CR-61-N)**

---

Wade H. Eldridge, Denver, Colorado, for Defendant-Appellant.

Andrew A. Vogt, Assistant United States Attorney (Jerry N. Jones, Assistant United States Attorney, and William J. Leone, United States Attorney, on the brief), Denver, Colorado, for Plaintiff-Appellee.

---

Before **MURPHY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I. Introduction

Defendant-Appellant William John Yehling was tried and convicted in the

United States District Court for the District of Colorado of conspiracy to

distribute and to possess with intent to distribute methamphetamine. He was sentenced to eighteen months' imprisonment followed by three years' supervised release. Shortly after the district court entered judgment, Yehling filed a motion for a new trial based on newly discovered evidence. The district court denied the motion approximately four years later. While the motion was pending, Yehling was free on a personal recognizance bond. Yehling raises two issues on appeal. First, he challenges the sufficiency of the evidence supporting his conviction. Second, he argues the district court's delay in deciding his motion for a new trial deprived the court of jurisdiction and constituted a denial of Yehling's right to a speedy trial and due process of law. This court exercises jurisdiction pursuant to 18 U.S.C. § 1291. We conclude Yehling failed to timely assert his speedy trial and due process rights and did not allege substantial prejudice resulting from the district court's delay in deciding his motion for a new trial. His unreasonable delay claims are therefore **denied**. We further **affirm** Yehling's conviction.

## II. Background

Yehling was one of nineteen defendants charged in a twenty-one-count superceding indictment with conspiracy to distribute and to possess with intent to distribute methamphetamine, in violation of 18 U.S.C. § 2 and 21 U.S.C.

-2-

§§ 841(a)(1) and 846.[1] The indictment alleged a conspiracy whereby methamphetamine was obtained in California and Colorado for resale to distributors in Ouray County, Colorado. The indictment alleged Yehling conspired to supply methamphetamine to codefendants Perry Wherley and Eric Avril in Colorado.

Yehling and six other defendants were tried jointly. Defendant Wherley, who had entered into a plea agreement with the government, testified that in 1996, he and defendant Brenda Paul discussed traveling to California to obtain methamphetamine for resale in Colorado. Thereafter, Wherley and Paul traveled to California every other weekend to purchase three to four ounces of methamphetamine from defendant Jodey Gravett. Wherley would then cut the methamphetamine into gram quantities and package it for resale to customers in Ouray County. After Wherley and Paul had a disagreement, Michael Sullings began to accompany Wherley on his trips to California. Wherley testified he and Sullings made ten to twelve trips from Colorado to California, purchasing between two and four ounces of methamphetamine from Gravett each time. After Sullings was arrested, defendant Avril accompanied Wherley to California. For these trips, Avril located a new source, defendant Robert Silcock. Wherley

_____

[1]The indictment charged other coconspirators with drug possession, witness tampering, and use of a firearm in relation to a drug trafficking offense. Yehling, however, was charged only with one count of conspiracy to distribute methamphetamine.

-3-

testified he and Avril traveled to California once a month for several months, purchasing two to three ounces of methamphetamine each time. In July 1998, Wherley stopped traveling to California and, instead, began obtaining methamphetamine in Colorado.

Wherley testified he approached Yehling, whom he had met when they worked together at Blackhawk Construction, in an attempt to locate someone to supply large quantities of methamphetamine in Colorado. Yehling located a potential source named Jovanni. The FBI intercepted several subsequent telephone conversations between Wherley, Avril, and Yehling discussing the source.[2] In September 1998, Yehling called Wherley to inform him Avril had stopped by Yehling's house to get "a little bit" and was "really happy with the stuff." ROA, Supp. Vol. III, Ex. 49. Yehling indicated the price was down to $700 per ounce. Wherley asked whether Yehling had more available immediately. Yehling stated, "I wanted to make sure everybody was satisfied before I did anything different," but indicated he could obtain more the next day. ROA, Supp. Vol. III, Ex. 49. Yehling also stated he was "in with the Mexican cartel" and was interested in "turn[ing] over a bunch and make[ing] some dough." ROA, Supp. Vol. III, Ex. 49.

---

[2]The FBI obtained a warrant to place a wiretap on Wherley's residential telephone in August 1998. Recordings of intercepted telephone calls were admitted into evidence at trial and played for the jury.

Three days later, in another recorded conversation, Yehling told Wherley his source wanted $1000 per ounce. Yehling indicated he thought the price was too high and would try to find another source. Several weeks later, Yehling called Wherley to ask if he wanted to "place an order." ROA, Supp. Vol. III, Ex. 57. Wherley requested an eight-ball (three-and-one-half grams of methamphetamine) and then called Avril to inform him of the deal. Avril asked whether Yehling could supply ounce quantities. Wherley replied that Yehling could, but his source wanted too much money.

At trial, Wherley admitted Yehling had provided samples from his source. Nevertheless, Yehling argued Wherley indicated a deal was never reached and thus Yehling did not provide Wherley with any methamphetamine for the purpose of redistributing it to others. Avril, who had also entered into a plea agreement with the government, testified he purchased an eight-ball of methamphetamine from Yehling on one occasion. Avril indicated that if he "liked it," he and Wherley would purchase ounce quantities from Yehling's source. ROA, Vol. X at 1273. Avril stated, however, the methamphetamine was intended for his personal use.

Yehling was interviewed by FBI Special Agent Emerson Buie after his arrest. Buie testified that Yehling admitted knowing Wherley was buying and selling methamphetamine. Yehling also knew Wherley had made several trips to California with Avril and Sullings to obtain methamphetamine. Yehling told Buie

that Wherley approached him at work seeking a local supplier in Colorado. Yehling admitted to locating a potential source named Jovanni, introducing Wherley to Jovanni, and providing Avril with less than a quarter gram of methamphetamine as a sample. Yehling's residence was searched, but no drugs, baggies, scales, or large sums of cash were found.

At the close of evidence, the jury returned a verdict finding Yehling, and five of his codefendants, guilty of conspiracy to distribute and to possess with intent to distribute methamphetamine. The district court sentenced Yehling to eighteen months' imprisonment followed by three years' supervised release. On December 4, 2001, Yehling filed a motion for a new trial based on newly discovered evidence. At trial, Avril had testified Justin Coykendall told him Yehling gave Coykendall methamphetamine to give to Avril. Yehling's motion for a new trial asserted he had located Coykendall, and Coykendall would deny the statement attributed to him by Avril. Yehling also filed a motion to stay his obligation to surrender for service of his sentence until the district court ruled on his motion for a new trial. The district court granted the stay.

The district court did not decide Yehling's motion for a new trial for almost four years. In March 2004 and 2005, Yehling filed motions seeking the district court's permission to travel to Cozumel, Mexico for his honeymoon and Boston to watch his brother run the Boston Marathon, respectively. Both motions indicated Yehling's motion for a new trial was still pending before the district court. The

district court granted permission for Yehling to travel on both occasions, but did not rule on Yehling's motion for a new trial.

Recognizing Yehling's motion had been pending for almost four years, the government requested a status conference in June 2005. Yehling subsequently filed a motion seeking resentencing in light of *United States v. Booker*, which had been decided by the Supreme Court while Yehling's motion for a new trial was pending. 543 U.S. 220 (2005). Yehling requested he be resentenced to probation for time already served. On August 26, 2005, the district court granted Yehling's motion for resentencing, but denied his motion for a new trial. The court concluded the new evidence offered by Yehling would merely impeach Avril's testimony and was not likely to result in an acquittal upon retrial because other evidence presented by the government tended to establish Yehling's guilt. Yehling was again sentenced to eighteen months' imprisonment followed by three years of supervised release. Yehling then filed a motion to dismiss for lack of jurisdiction, arguing the district court's delay in ruling on his motion for a new trial deprived the court of jurisdiction and constituted denial of a speedy trial and due process of law. Yehling filed a notice of appeal before the district court ruled on his motion to dismiss for lack of jurisdiction.[3]

---

[3]The ten-day time period for Yehling to file a notice of appeal began to run when the district court entered its order denying Yehling's motion for a new trial on August 26, 2005. *See* Fed. R. App. P. 4(b)(3)(A)(ii). To comply with the timeliness requirements of Rule 4(b) of the Federal Rules of Appellate Procedure
(continued...)

## III. Discussion

### A. Sufficiency of the Evidence

Yehling moved for judgment of acquittal at the close of the government's case-in-chief. The district court denied the motion, concluding the government had presented sufficient evidence to submit the case to the jury. Yehling did not introduce any evidence in his defense. Yehling argues the district court erred in denying his motion for judgment of acquittal because the government failed to introduce sufficient evidence to support his conviction for conspiracy to distribute methamphetamine.

In reviewing the sufficiency of the evidence to support a conviction, we review the record *de novo* to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Zunie*, 444 F.3d 1230, 1233 (10th Cir. 2006). We consider both direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom, but do not weigh conflicting evidence or consider the credibility of witnesses. *Id.*; *United States v. Lopez*, 576 F.2d 840, 843 (10th Cir. 1978).

---

[3](...continued)
and preserve his appeal of the sufficiency of the evidence, Yehling was required to file a notice of appeal by September 6, 2005. At that time, the district court had not yet ruled on Yehling's motion to dismiss for lack of jurisdiction.

To prove conspiracy, the government must show (1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent. _United States v. Small_, 423 F.3d 1164, 1182 (10th Cir. 2004). Yehling challenges only the government's proof with respect to the second and fourth elements.

To prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendant knew all the details or all the members of a conspiracy. _Id._ Rather, the government only needs to demonstrate the "defendant shared a common purpose or design with his alleged coconspirators." _United States v. Evans_, 970 F.2d 663, 669 (10th Cir. 1992). The essential objectives of the conspiracy in this case included obtaining methamphetamine in California and Colorado and reselling the methamphetamine for profit in Ouray County. The government presented sufficient evidence to enable a rational juror to find Yehling had knowledge of the first essential objective, obtaining methamphetamine in California and Colorado. FBI Special Agent Buie testified Yehling admitted to knowing Wherley had made several trips to California with Avril and Sullings to obtain methamphetamine. Yehling also told Buie that Wherley approached him about locating a supplier in Colorado. A rational juror thus could have found beyond a reasonable doubt that Yehling knew the conspiracy involved obtaining methamphetamine in California and Colorado.

The conspiracy also entailed the redistribution of methamphetamine obtained in California and Colorado to residents of Ouray County. Therefore, the government was required to demonstrate Yehling knew Wherley and Avril intended to redistribute the methamphetamine they purchased from him, and not to keep it for personal use. Although the government did not present any direct evidence regarding Yehling's knowledge of this objective, the evidence presented was sufficient to permit a rational juror to infer Yehling knew the methamphetamine was for distribution. Avril testified Yehling provided him with an eight-ball of methamphetamine on a single occasion. Although this quantity is consistent with personal use, the evidence suggests the eight-ball was merely a sample and Yehling intended to provide larger quantities in the future. Wherley testified he originally approached Yehling in an attempt to find a source in Colorado to provide large quantities of methamphetamine. In a telephone conversation intercepted by the FBI shortly after Yehling provided the eight-ball to Avril, Wherley asked Yehling if he had more methamphetamine available. Yehling indicated he could obtain more the next day, but wanted to ensure everyone was satisfied before doing so. Yehling also told Wherley he was interested in "turn[ing] over a bunch and make[ing] some dough." ROA, Supp. Vol. III, Ex. 49. In a subsequent conversation, Yehling and Wherley discussed the price for an ounce of methamphetamine. Wherley testified that four or five people could use an ounce of methamphetamine in one week, and indicated he

had purchased ounce quantities in California which he then cut and packaged as gram quantities for resale. Based on this evidence and Yehling's knowledge that Wherley had bought and sold methamphetamine in the past, a rational juror could infer Yehling knew the ounce quantities Wherley and Avril were considering purchasing from his source were for distribution. The government, therefore, submitted sufficient evidence to prove Yehling's knowledge of the essential objectives of the conspiracy.

Yehling also challenges the sufficiency of the government's evidence with respect to the element of interdependence. Interdependence exists when "each alleged coconspirator . . . depend[s] on the successful operation of each 'link' in the chain to achieve the common goal." _United States v. Dickey_, 736 F.2d 571, 582 (10th Cir. 1984). In other words, each coconspirator's "actions must facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole." _Evans_, 970 F.2d at 670 (quotation and alterations omitted). Yehling contends the eight-ball he sold to Avril is insufficient to demonstrate interdependence when considered in the context of the large quantities of methamphetamine Wherley regularly imported from California. Yehling's argument, however, ignores the evidence suggesting the eight-ball was merely a sample to be followed by larger quantities of methamphetamine in the future.

Wherley testified that after several years of traveling to California to obtain methamphetamine for resale in Colorado, he wanted to locate a supplier in

Colorado. Wherley approached Yehling for assistance. Yehling found a source, introduced him to Wherley, and supplied samples with the understanding that larger quantities could be purchased in the future. Because Yehling provided a potential local source of methamphetamine that could then be resold by Wherley and Avril to customers in Ouray County, his actions facilitated the conspiracy. Each alleged coconspirator was dependent upon the activities of the other coconspirators to achieve the common goal of distributing methamphetamine for profit. Wherley and Avril relied on Yehling, and others, to provide methamphetamine for redistribution. Yehling in turn relied on Wherley, Avril, and the distributors and customers further down the chain to provide a market for methamphetamine he provided. Without the assistance of Wherley, Avril, and other coconspirators, Yehling would not have had the opportunity to "turn over a bunch and make some dough." ROA, Supp. Vol. III, Ex. 49. Finally, the distributors and customers in Ouray County were dependent on Wherley, Avril, and, further up the chain, Yehling, to provide methamphetamine.

In establishing interdependence, it is irrelevant that Yehling never actually provided large quantities of methamphetamine to Wherley for redistribution. The essence of a conspiracy is an agreement to violate the law. _United States v. Johnson_, 977 F.2d 1360, 1371 (10th Cir. 1992). Yehling's failure to provide large quantities of methamphetamine, as planned, did not negate the unlawful agreement; it merely made the conspiracy less successful than it might otherwise

-12-

have been because Wherley and Avril were required to locate another local source or distribute less methamphetamine. Based on the evidence presented by the government, a rational juror could have found beyond a reasonable doubt that the alleged coconspirators were interdependent. Therefore, Yehling's conviction for conspiracy to distribute and to possess with intent to distribute methamphetamine is supported by sufficient evidence.

## B. Unreasonable Delay Claims

Yehling also argues the district court's four-year delay in ruling on his motion for a new trial deprived the district court of jurisdiction and constituted denial of a speedy trial and due process of law. He asks this court to reverse his conviction and vacate his sentence.

We first address Yehling's jurisdictional claim.[4] Jurisdictional questions are reviewed *de novo*. *Huerta v. Gonzales*, 443 F.3d 753, 755 (10th Cir. 2006). In support of his claim that the district court lost jurisdiction over his case because of its delay in ruling on his motion for a new trial, Yehling cites a single Colorado state court case. *See Grundel v. People*, 79 P. 1022 (Colo. 1905). The defendant in *Grundel* pleaded guilty to gambling and was sentenced three years

___

[4]The relief Yehling seeks in raising his jurisdictional claim is unclear. If, as Yehling argues, the district court lost jurisdiction because of the delay, the result would be invalidation of the district court's actions after the delay, i.e., the denial of Yehling's motion for a new trial and Yehling's resentencing. Success on his jurisdictional claim would not affect Yehling's conviction or his original sentence because Yehling does not challenge the district court's jurisdiction at the time judgment was entered.

later. The appellate court dismissed the charges, concluding "[i]n the absence of a permissive statute, the indefinite postponement of sentence upon one convicted of crime deprives the court of jurisdiction to pronounce sentence at a subsequent term." *Id*. at 1023. We express no opinion regarding the holding of *Grundel* because it is inapposite here. The district court imposed Yehling's sentence four months after he was found guilty. During the pendency of Yehling's motion for a new trial, a valid, final sentence existed. Thus, in contrast to *Grundel*, Yehling's sentence was not indefinitely postponed. Yehling has not cited, and we cannot find, any authority for the proposition that a district court loses jurisdiction as a result of delay in deciding a motion for a new trial after the defendant has been sentenced. We therefore reject Yehling's jurisdictional claim.

Yehling also contends the district court's delay deprived him of a speedy trial and due process of law. In evaluating claims of unreasonable delay in criminal cases, we review questions of law *de novo* and questions of fact for clear error. *United States v. Davis*, 1 F.3d 1014, 1017–18 (10th Cir. 1993); *see also United States v. Smith*, 94 F.3d 204, 208 (6th Cir. 1996). Yehling raised his speedy trial and due process claims for the first time in a motion to dismiss for lack of jurisdiction after the district court denied his motion for a new trial. Yehling then filed a notice of appeal, depriving the district court of jurisdiction before it ruled on his motion to dismiss. We generally do not consider issues on appeal that were not ruled on below. *R. Eric Peterson Constr. Co. v. Quintek,*

-14-

*Inc. (In re R. Eric Peterson Constr. Co.)*, 951 F.2d 1175, 1182 (10th Cir. 1991). Under the unique facts presented here, however, we need not remand the case to the district court to address Yehling's unreasonable delay claims in the first instance. Even accepting Yehling's allegations as true, he has not demonstrated a speedy trial or due process violation.

The Sixth Amendment guarantees all criminal defendants the right to a speedy trial; we have applied this right from arrest through sentencing. *Perez v. Sullivan*, 793 F.2d 249, 253 (10th Cir. 1986); *see Pollard v. United States*, 352 U.S. 354, 361 (1957). Protection against unreasonable delay in the appellate process is similarly provided by the Fifth Amendment right to due process of law. *See Harris v. Champion*, 15 F.3d 1538, 1558 (10th Cir. 1994) (applying, through Fourteenth Amendment, right to due process when state delayed prosecution of habeas petitioner). Yehling's claim, however, does not fit squarely into either of these categories. The delay in this case occurred after Yehling's sentence was imposed, but before he filed a notice of appeal. Nevertheless, the interests protected by preventing unreasonable delay from arrest through sentencing and throughout the appellate process are also endangered by delay in deciding a motion for a new trial based on newly discovered evidence. Faded memories or misplaced evidence may impair a defendant's ability to adequately defend himself if he is granted a new trial. *See Barker v. Wingo*, 407 U.S. 514, 526, 532 (1972). Delay may also produce anxiety or drain a defendant's financial resources.

-15-

*Moore v. Arizona*, 414 U.S. 25, 27 (1973). Because of these similarities, we see no reason to exempt a motion for a new trial based on newly discovered evidence from protection against unreasonable delay. We therefore examine the delay in this case to determine if it rises to the level of a constitutional violation.

In *Barker*, the Supreme Court established a balancing test to determine whether a particular delay violates a defendant's right to a speedy trial. 407 U.S. at 530. The Court identified four factors that should be assessed and balanced: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Id*. None of the factors are necessary or sufficient; rather, the factors are related and should be considered together with other relevant circumstances. *Id*. at 533. Although *Barker* addressed only a defendant's right to a speedy trial, this court subsequently adopted the *Barker* analysis in determining whether a defendant's due process right to a timely direct criminal appeal in state court had been violated. *Harris*, 15 F.3d at 1559. Because the *Barker* test also provides an appropriate framework to evaluate delay in deciding a motion for a new trial based on newly discovered evidence, we apply it in assessing Yehling's claim.

The first factor, length of delay, functions as a "triggering mechanism." *Barker*, 407 U.S. at 530. The remaining factors are examined only if the delay is long enough to be presumptively prejudicial. *Id*. Yehling filed his motion for a new trial on December 4, 2001. The government filed its response on December

-16-

26, 2001. The district court denied Yehling's motion three years and eight months later. Although there is no definitive number of months or years that will trigger consideration of the remaining *Barker* factors, the delay of three years and eight months in this case is presumptively prejudicial. *See United States v. Batie*, 433 F.3d 1287, 1290 (10th Cir. 2006) (observing pretrial delay approaching one year sufficient to trigger *Barker* analysis for determining speedy trial violation); *Harris*, 15 F.3d at 1560 (concluding two-year delay in adjudicating direct criminal appeal gives rise to presumption of inordinate delay); *Perez*, 793 F.2d at 255 (stating fifteen-month delay in sentencing was sufficient to require inquiry into remaining *Barker* factors). Thus, we must examine the remaining *Barker* factors. Moreover, because the delay here was substantial and Yehling's motion for a new trial did not raise complex legal or factual issues, the length of delay weighs in Yehling's favor. *Barker*, 407 U.S. at 530–31 (observing complexity of case may affect reasonableness of delay).

The second factor, the reason for the delay, "weighs against the government in proportion to the degree to which the government caused the delay." *Batie*, 433 F.3d at 1291. Purposeful delay weighs heavily against the government. *Barker*, 407 U.S. 531. "A more neutral reason such as negligence or overcrowded courts [is] weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id*. Yehling does not allege any attempt at

intentional delay by the government; rather, he acknowledges the delay in this case was the result of negligence. Thus, this factor also weighs in Yehling's favor, but not heavily.

The third factor assesses whether a defendant asserted his right to adjudication without unreasonable delay. *Id.* In *Barker*, the Supreme Court rejected the contention that a defendant who fails to demand a speedy trial waives the right. *Id.* at 528. The Court also declined to adopt the antithetical view that a defendant has no duty to assert the right. *Id.* Instead, the Court determined a defendant's assertion of, or failure to assert, his right to a speedy trial is merely one factor to be considered in determining whether the right has been violated. *Id.*

Yehling filed motions in March 2004 and 2005 seeking permission from the district court to travel to Cozumel and Boston, respectively. Both motions indicated Yehling had filed a motion for a new trial on December 4, 2001, and the motion was still pending before the district court. Neither motion, however, asserted Yehling's right to a timely decision on his motion for a new trial or requested that the district court rule on the motion without further delay. *See Perez*, 793 F.2d at 256 (observing defendant's failure to file a formal motion requesting sentencing was indicative of defendant's acquiescence in fifteen-month delay); *see also Barker*, 407 U.S. at 529. In fact, Yehling did not file a motion asserting his right to a decision without unreasonable delay until after the district

court had denied his motion for a new trial. A defendant's burden to actively assert his right "is not satisfied merely by moving to dismiss after the delay has already occurred." *Batie*, 433 F.3d at 1291. The third factor thus weighs against Yehling.

The final *Barker* factor analyzes prejudice to the defendant resulting from the delay. *Barker*, 407 U.S. at 532. Prejudice is assessed in light of the interests the speedy trial and due process rights were designed to protect: preventing oppressive incarceration, minimizing anxiety and concern of the defendant, and limiting the possibility that the defense will be impaired. *Id*. at 532. We observed in *Perez* that once a defendant has been convicted, the rights of society increase in proportion to the rights of the defendant. 793 F.2d at 256. Post-conviction prejudice therefore "must be substantial and demonstrable." *Id*.

Yehling was free on a personal recognizance bond during the pendency of his motion for a new trial. Nevertheless, he asserts the delay interfered with his personal liberty because he was under the supervision of federal probation officials and subject to drug screening. Although Yehling was subject to supervision during the pendency of his motion,[5] he was able to maintain stable

---

[5]Yehling's bond conditions included the following: remain in Colorado absent prior permission from the district court, report regularly to a supervising probation officer, refrain from excessive use of alcohol and any use of a controlled substance, submit to random urine analysis, and participate in a substance abuse counseling program if deemed advisable by the supervising officer.

employment, marry, and purchase a home. Moreover, on the only two occasions Yehling sought permission from the district court to leave the state of Colorado, it was granted. Thus, his liberty was not greatly restricted. *See Barker*, 407 U.S. at 532 (identifying prevention of oppressive incarceration as interest protected by right to speedy trial).

Yehling also asserts he suffered anxiety because of the delay in resolution of his motion for a new trial. To establish prejudice as a result of anxiety, a defendant must make a particularized and substantial showing of anxiety distinguishable from anxiety suffered by other similarly situated defendants. *Harris*, 15 F.3d at 1565. Even assuming Yehling suffered anxiety, he has not alleged particular or substantial anxiety that makes his situation different from that of other defendants awaiting a decision on a motion for a new trial. The facts of this case are similar to *Barker*. 407 U.S. 514. The defendant in *Barker* spent ten months in jail awaiting trial before being released on bond. *Id.* at 534. The defendant remained free on bond for over three years before he was finally tried and convicted. *Id.* In assessing the defendant's speedy trial claim, the Court acknowledged the defendant suffered some prejudice by living "under a cloud of suspicion and anxiety" for over four years. *Id.* The Court, however, concluded the "prejudice was minimal" in light of the defendant's failure to allege the delay impaired his defense. *Id.* Because Yehling's alleged prejudice is similarly

-20-

minimal,[6] he has failed to make the required showing of substantial prejudice.

Thus, the fourth factor weighs against Yehling.

Although the first two *Barker* factors—length of delay and reason for the delay—weigh in favor of finding a constitutional violation in this case, the last two factors do not. Yehling did not timely assert his right to a decision without unreasonable delay, and he failed to allege particularized and substantial prejudice resulting from the delay. Though none of the *Barker* factors are dispositive, the Supreme Court has observed a defendant's assertion of his right carries strong weight in determining whether the right was actually violated because "[t]he more serious the deprivation, the more likely a defendant is to complain." *Barker*, 407 U.S. at 531. Additionally, we have indicated the necessity of showing substantial prejudice dominates the *Barker* balancing test once a defendant has been convicted. *Perez*, 793 F.2d at 256. Because the first and second *Barker* factors do not compensate for Yehling's failure to timely assert his right or allege substantial prejudice, Yehling has failed to establish the delay deprived him of a speedy trial or due process of law.

---

[6]Yehling does not assert the delay impaired his defense in the event of a retrial, and he does not appeal the district court's denial of his motion for a new trial.

-21-

## IV. Conclusion

For the foregoing reasons, Yehling's unreasonable delay claims are

**DENIED** and his conviction is **AFFIRMED**.