In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3961

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GUY J. WESTMORELAND,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:98-cr-30022-WDS-2—**William D. Stiehl**, *Judge.*

ARGUED OCTOBER 12, 2012—DECIDED MARCH 25, 2013

Before KANNE, TINDER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Over a decade ago, defendant Guy Westmoreland was convicted in two trials, in the first for conspiracy to distribute a controlled substance, and in the second for five additional counts stemming from the murder of the wife of his partner in drug-dealing: causing the death of a person through the use of a firearm during a drug trafficking crime; using inter-state commerce facilities to commit murder for hire;

conspiring to commit murder for hire; tampering with a witness by committing murder; and causing the death of a witness through use of a firearm. His convictions were affirmed on appeal. See *United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001) ("*Westmoreland I*") (drug conspiracy conviction); *United States v. Westmoreland*, 312 F.3d 302 (7th Cir. 2002) ("*Westmoreland II*") (murder-related convictions).

After he was convicted in the murder case, and while his appeal from those convictions was pending in *Westmoreland II*, Westmoreland filed a motion for new trial under Federal Rule of Criminal Procedure 33. The motion argued that the government's supposedly outrageous conduct violated his right to due process of law and that a new trial on his murder convictions was warranted because of newly discovered evidence. He filed his motion on October 4, 2002. Other than granting the government an extension of time for its response, the district court took no action on Westmoreland's motion for several years. In the meantime, Westmoreland requested the appointment of counsel and complained to the district court about the delay. The district court ultimately denied his motion on December 13, 2010, more than eight years after it was filed. *United States v. Westmoreland*, 2010 WL 5141770 (S.D. Ill. Dec. 13, 2010). Westmoreland appeals.

We review the denial of a motion for a new trial for an abuse of discretion. *United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011). "The district court abuses its discretion when it makes an error of law or when it

makes a clearly erroneous finding of fact." *United States v. Freeman*, 650 F.3d 673, 678-79 (7th Cir. 2011). Westmoreland also argues that the district court's delay and its refusal to appoint counsel violated his Sixth Amendment rights, and we review those claims *de novo*. *United States v. Foster*, 701 F.3d. 1142, 1150 (7th Cir. 2012) ("We 'review de novo a district court ruling that affects a defendant's Sixth Amendment rights.'"), quoting *United States v. Nettles*, 476 F.3d 508, 517 (7th Cir. 2007). Though we are troubled, to say the least, by the district court's unexplained eight-year delay in ruling, Westmoreland's arguments on the merits do not warrant overturning his convictions or ordering a new trial. The district court did not abuse its discretion in denying a new trial, and it correctly found that his constitutional rights were not violated. We affirm.

I. *Factual and Procedural Background*

A brief background of Westmoreland and his crimes will serve to frame this case. Additional chilling details are available in *Westmoreland I* and *II*. In 1997 and 1998, Westmoreland and Richard Abeln were partners in a drug distribution operation. Using Abeln's airplane, the pair imported nine kilograms of cocaine and about ninety pounds of marijuana from Texas to a small airport in Illinois. In late 1997, Abeln wanted to end his marriage but did not want to split his assets with his wife through a divorce. Instead, he decided to have her killed. Westmoreland had previously mentioned to Abeln that he could have someone killed for $1,000.

Based on that comment, Abeln asked Westmoreland about the possibility of killing his wife. Initially, Westmoreland declined. Then, to persuade him to take the job, Abeln told Westmoreland (falsely) that his wife had discovered their drug trafficking business and was going to inform law enforcement. Westmoreland changed his mind and began making arrangements.

Westmoreland recruited Deandre Lewis to commit the murder. Abeln and Westmoreland agreed that the murder would occur on December 27, 1997, at a local airport and that it would be staged as a robbery gone bad. Lewis drove to the scene in a pick-up truck provided by Westmoreland. Abeln drove his wife to the location in the family car. The couple's twelve-year-old son was also in the car. While the Abeln family was there, Lewis approached their car and demanded Mrs. Abeln's jewelry. He pulled her from the car and shot her with two rounds from a double-barreled shotgun. She died at the scene.

At the time of the murder, Westmoreland was on vacation with his family in Florida to establish an alibi. When he returned, however, he helped Lewis dispose of Mrs. Abeln's jewelry. He also remained in regular contact with Abeln as the investigation began, advising Abeln about how to mislead the police. In spite of those efforts, the "robbery gone bad" scenario fell apart quickly under police scrutiny. The investigation soon led to Westmoreland. He was arrested on January 6, 1998. He was convicted on August 20, 1998 of the drug conspiracy and on June 28, 2001 of crimes related to the

murder. The district court sentenced Westmoreland to 240 months on the drug conspiracy charge and life imprisonment on the murder-related charges, to be served concurrently.

## II. *Due Process*

Westmoreland's opening argument in this appeal is that certain conduct by the government was so outrageous that his convictions should be vacated and the charges against him dismissed on due process grounds. Though the facts presented are certainly unusual, his legal argument is not persuasive. After Westmoreland was convicted of the drug charge in *Westmoreland I*, but before he was tried for the murder charges in *Westmoreland II*, the government learned that one of the lead investigating agents, an Illinois State Police agent named Martin Milkovich, had engaged in a sexual affair with Westmoreland's wife, Bronnie. Initial indications were that the affair began while the case against Westmoreland was building and lasted several months. Upon discovering the affair, the federal government dropped its efforts to seek the death penalty against Westmoreland and Lewis. The government did not call Milkovich as a witness in Westmoreland's second trial, though Bronnie Westmoreland did testify. When questioned about the affair with Milkovich, she testified that the affair lasted from November 1999 until April 2000.

There is no question that the affair tainted Milkovich. In a separate investigation, the Illinois State Police inter-

viewed Assistant United States Attorney Kit Morrissey, one of the government's lead prosecutors, concerning the affair. Morrissey said that it would have been "important" for him to know that Milkovich had established a sexual relationship with Bronnie:

> because of the obvious damage to the case that that could cause. That would have been something we would have had to disclose, which we did when we did find out about it. And it would also have been — obviously, it would have told me that neither of them can be trusted, and that — I mean, it would affect my case in every aspect.

Until the affair was discovered, Morrissey explained, Milkovich had been an important government witness who was "central to the investigation." The Illinois State Police ultimately issued a formal complaint against Milkovich and his employment was terminated.

Westmoreland argues that Milkovich's affair with Bronnie Westmoreland was so outrageous that it infected the entire government investigation and prosecution, denying him due process of law. The argument is based on a dictum in *United States v. Russell*, 411 U.S. 423, 431-32 (1973), in which the Supreme Court rejected an entrapment defense in an early methamphetamine case. Writing for the Court, then-Justice Rehnquist speculated that the Court "may some day be presented" with conduct by government agents so outrageous that it should bar the government from prosecuting at all. In *Russell* itself, a government agent had provided one ingredient for the drug that was difficult but not impos-

sible to obtain. That was not so outrageous as to bar the prosecution, and the Supreme Court has not found such a bar in any other cases it has decided.

*Russell* offers no real guidance to lower courts as to the type or level of conduct by the government that might, standing alone, amount to a due process violation, though the dictum has been the focus of arguments by a number of defendants in the lower federal courts. Without such guidance from the Supreme Court, our court has disallowed such a defense in this circuit. See *United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011), citing *United States v. White*, 519 F.3d 342, 346 (7th Cir. 2008); *United States v. Garcia*, 89 F.3d 362, 367 (7th Cir. 1996); *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995).

Westmoreland points out that other circuits have recognized the outrageous conduct defense, though outright reversals on the defense are extremely rare. These few cases make clear that even if we were inclined to reexamine our precedent rejecting the defense, this case would not support the defense. Where it has been recognized, the defense has come into play only where the government's involvement created a crime or criminal enterprise that did not exist before, and where the government had to coerce the defendant to commit the crime by some unreasonable means. For example, in *United States v. Solorio*, 37 F.3d 454, 460-61 (9th Cir. 1994), the Ninth Circuit initially reversed a defendant's drug conviction on an outrageous conduct theory because the court believed that the amount the government paid

to an informant had depended on the defendant's eventual conviction and the quantity of drugs involved. The panel later withdrew that opinion. 53 F.3d 341 (9th Cir. 1995). See also, *e.g.*, *United States v. Mosley*, 965 F.2d 906, 908-09, 914 (10th Cir. 1992) (agent posing as drug dealer enticed defendant to buy quantity of cocaine; court found that although government's zeal was excessive, conduct was not sufficiently outrageous to find due process violation); *United States v. Twigg*, 588 F.2d 373, 380-81 (3d Cir. 1978) (outrageous conduct barred defendants' drug prosecution where government, through confidential informant, set up a methamphetamine lab and supplied equipment and ingredients).

This case is quite different from those. Westmoreland conspired to murder Mrs. Abeln without any coercion, assistance, or involvement by the government. The murder happened long before Milkovich met Bronnie Westmoreland. Even if we assume that the affair tainted Milkovich's investigation, the affair did not play any role in the crime itself. If the outrageous conduct defense were available at all, therefore, the affair would not satisfy the basic factual requirement for it to apply. Milkovich's relationship with Westmoreland's wife, although a serious lapse of Milkovich's professional judgment, was not an outrageous violation of Westmoreland's due process rights and does not warrant reversal. The district court did not err on this ground.

III. *Newly Discovered Evidence*

Westmoreland next argues that he should have a new trial on the basis of newly discovered evidence. Federal

Rule of Criminal Procedure 33(a) permits a district court to vacate any judgment and grant a new trial "if the interest of justice so requires." To show that the interest of justice requires a new trial, a defendant must provide evidence that (1) came to his knowledge only after trial; (2) could not have been discovered sooner through the exercise of due diligence; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial. See *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012), citing *United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005); *United States v. Reyes*, 542 F.3d 588, 595 (7th Cir. 2008). We "approach such motions with great caution and are wary of second-guessing the determinations of both judge and jury." *McGee*, 408 F.3d at 979, quoting *United States v. DePriest*, 6 F.3d 1201, 1216 (7th Cir. 1993). Westmoreland presents two categories of "newly discovered" evidence. We address each in turn.

A. *Timing of the Affair*

With his motion for a new trial, Westmoreland presented affidavits of three witnesses who stated that the affair between Milkovich and Bronnie Westmoreland began during Milkovich's investigation — not after the investigation had concluded, as Bronnie testified at trial. Amy Wade, Greg Schmidt, and Tina Kuehl all swore that they had witnessed encounters between Milkovich and Bronnie in 1998. Amy Wade stated that in May 1998, she and Bronnie went dancing all night with Milkovich. Greg Schmidt, a neighbor, testified that in August 1998,

he saw Milkovich visit Bronnie on several occasions, staying for several hours, sometimes overnight, with Milkovich sometimes leaving with different clothes than he had worn when he arrived. On one occasion Schmidt saw Bronnie and Milkovich kiss. The third affiant, Tina Kuehl, is Westmoreland's sister. She stated that in March 1998, she went into Bronnie's home and saw Milkovich and Bronnie leaving Bronnie's bedroom as Milkovich was tucking in his shirt.

Kuehl's testimony was not "new" — she submitted an affidavit in 2001, before the murder trial — but the trial court doubted Kuehl's credibility because of her relationship to Westmoreland and because Kuehl had assisted Bronnie in destroying evidence.[1] Westmoreland concedes that Kuehl's evidence is not new, but he argues that Wade's and Schmidt's evidence is new. He argues that the district court's negative assessment of Kuehl's credibility was the reason he did not anticipate or discover earlier that other witnesses could corroborate Kuehl's testimony, and it was only after trial, when Wade and Schmidt came forward, that Kuehl's statement had any force. Westmoreland concludes that if this corroborating evidence had come to light earlier, it

---

[1] Before trial, on May 18, 2001, Westmoreland submitted a document to the district court captioned "Ex Parte Supplemental Response To Government's Motion In Limine Regarding Milkovich/Bronnie Westmoreland Relationship." In it, he asserted that he had a witness, presumably Kuehl, with information that Milkovich and Bronnie were together as early as February or March 1998.

likely would have led to his acquittal because it would have suggested to the jury that Milkovich's part of the murder investigation had been corrupted by the affair.

Westmoreland's argument shows one of its fatal flaws. For the court to treat the Wade and Schmidt affidavits as new evidence, Westmoreland must demonstrate that they could not have been discovered sooner through the exercise of due diligence. Before his trial began, Westmoreland knew of the facts underlying the affidavits. He knew of the affair, and he believed that it had begun earlier than the government and Bronnie said it did. Though he may have thought at the time that it was not worthwhile to pursue other witnesses who could corroborate his sister, he does not argue that he could not have discovered such witnesses sooner, only that he chose not to try. That is not due diligence. See *United States v. Theodosopoulos*, 48 F.3d 1438, 1449 (7th Cir. 1995) (witness's post-trial affidavit was not "newly discovered" where defendant failed to exercise due diligence; defendant took no steps to secure witness's testimony but instead sought a missing witness instruction); *United States v. McGaughey*, 977 F.2d 1067, 1075 (7th Cir. 1992) (failure to conduct exhaustive search for document showed lack of necessary due diligence). This was not newly discovered evidence warranting a new trial.

Westmoreland also fails to show that he likely would have been acquitted if the jury had heard that Milkovich's affair overlapped with his investigation. There is no doubt that Milkovich's behavior tainted the

government's case, and the longer the affair, the more extensive we can assume the taint would have been. We are not persuaded, though, that evidence of a longer affair would have led to acquittal. The jury that convicted Westmoreland of Mrs. Abeln's murder learned that Milkovich and Bronnie had had an affair. Westmoreland has not identified any particular evidence against him that should be deemed less credible or probative if the affair began back in the spring of 1998, which would still have been several months after Mrs. Abeln's murder. It is highly doubtful that the outcome of the murder trial would have been any different if the jury had heard evidence — evidence that was disputed by the government — that the affair had begun while Milkovich was still investigating the case. In sum, the Wade and Schmidt affidavits also are not "newly discovered evidence" that would warrant a new trial.[2]

B. *Milkovich's Recantation*

Throughout the government's investigation and prosecution, Milkovich stated that when Westmoreland was

---

[2] Westmoreland also argues that the district court erred by rejecting the Wade and Schmidt affidavits because they lacked "any foundation as to how the affiants may have been able to identify the individual allegedly involved with Bronnie as Milkovich." *Westmoreland*, 2010 WL 5141770, at *4. Without such a showing, the district court found that the affidavits would have been inadmissible. Given our resolution of the question of whether the affidavits warrant a new trial, their admissibility is moot.

arrested, he said he did not know anything about a "murder-for-hire" scheme. The evidence was important because no one had said anything to Westmoreland at that point about a murder. See Dkt. 904 Ex. D (Milkovich Jan. 6, 1998 investigative report) ("WESTMORELAND told agents he didn't know anything about any murder, especially a murder for hire, but did admit to selling drugs for RICHARD ABELN."); Dkt. 904 Ex. F (Milkovich grand jury testimony). Milkovich repeated this testimony in *Westmoreland I*, Dkt. 904 Ex. H (Milkovich trial testimony), but Milkovich did not testify in *Westmoreland II*. Westmoreland argues in this appeal — which again, is an appeal from the district court's denial of his motion for a new murder trial in *Westmoreland II* — that Milkovich later recanted these statements and that his recantation is new evidence warranting a new trial on the murder charges. We disagree.[3]

---

[3] The district court considered this evidence under the standard used to consider the impact of recanted *trial testimony*. Under that standard, the court must consider whether: (1) it is reasonably well satisfied that testimony given by the witness was false; (2) the jury might have reached a different conclusion absent the false testimony or if it had known that the testimony was false; and (3) the defendant was taken by surprise and was unable to meet the false testimony or did not know of its falsity until after trial. See *United States v. Taylor*, 600 F.3d 863, 870 (7th Cir. 2010). Westmoreland argues that the district court erred when it considered Milkovich's recantation under this standard. Milkovich did not testify in *Westmoreland II*, so whatever Milkovich might have recanted

(continued...)

In support of his motion for a new trial, Westmoreland presented the affidavits of his friend, Steve Korris, and his sister, Renee Westmoreland. They stated that they met with Milkovich on January 8, 2004, and that at the meeting he recanted his earlier statements, telling Korris and Renee Westmoreland that Westmoreland made no statement to police whatsoever upon his arrest and instead "lawyered up." See Dkt. 904, Ex. B (3/11/2004 Korris Affidavit) (Milkovich told Korris that "Guy Westmoreland made no statement whatsoever to police when arrested in connection with the murder of Debra Abeln."); *id.* at Ex. C (3/10/2004 R. Westmoreland Affidavit) ("Marty said that on the morning of Guy Westmoreland's arrest, he or Kale Jackson, a FBI agent, had NOT gotten any type of statement from Guy Westmoreland, in fact he 'lawyered up.' They couldn't get him to talk to them at all.").

Again, to satisfy the standard for newly discovered evidence, Westmoreland must show that the evidence: (1) was discovered after trial; (2) could not have been discovered sooner with due diligence; (3) was material and not simply impeaching or cumulative; and (4) if presented at a new trial, would probably result in

---

[3] (...continued)

was not trial testimony in that case. Westmoreland argues that the district court should have considered the evidence under the test for newly discovered evidence. The government does not argue otherwise. We review the district court's decision under the test for newly discovered evidence, but Westmoreland's claim fails under either test.

Westmoreland's acquittal. See *Hagler*, 700 F.3d at 1101. The Korris and Renee Westmoreland affidavits fail every prong of this test.

First, even if the evidence of what Milkovich said might have been new, Westmoreland's own statements at the time of his arrest could not have been "newly discovered" to Westmoreland. He was there and knew what he said or did not say at the time. Second, the evidence must be admissible to be material, and Milkovich's statements to Korris and Renee Westmoreland about what Westmoreland said would be inadmissible hearsay as proof of what Westmoreland said or did not say. Third, even if admitted, the statements would have served at most only to impeach the testimony of Master Sergeant Calvin Dye of the Illinois State Police, who did testify at Westmoreland's murder trial. Sergeant Dye was with Milkovich when Westmoreland was arrested, and he testified consistently with Milkovich's original statement. Fourth, it is unlikely that this evidence, had it been admitted, would have led to Westmoreland's acquittal. The case against Westmoreland was very strong, and the new evidence was weak. By the time of the murder trial, Milkovich's credibility was non-existent, and Dye's testimony was directly contrary on the subject. We reject Westmoreland's argument that the Korris and Renee Westmoreland affidavits amount to newly discovered evidence entitling him to a new trial.

IV. *Sixth Amendment Claims*

Westmoreland contends that his Sixth Amendment rights were violated in two ways. First, he submits that

his right to a speedy trial was violated by the district court's excessive delay in ruling on his motion for a new trial. Second, he argues that his right to counsel was violated. As troubling as the long delay in deciding the motion was, we find no reversible error on either ground.

A. *Delayed Denial of Motion for New Trial*

Westmoreland filed his motion for a new trial on October 4, 2002. His direct appeal was pending, and his motion was filed as a supplement to his appeal. He was represented by counsel at the time, but he prepared his motion for a new trial pro se. His lawyer filed Westmoreland's motion with the district court as a courtesy and described his action in a cover letter: "Although fashioned as an appellate brief, Mr. Westmoreland would like the pleading to be treated as a motion for [a] new trial based on newly discovered evidence, under Fed. R. Crim. P. Rule 33."

On January 22, 2003, the district court construed Westmoreland's October 4 papers as a Rule 33 new trial motion and ordered the government to file a response within 20 days. The court's order noted that after the court received the government's response, it would determine whether "an evidentiary hearing is required for resolution of the motion."

On February 4, 2003, Westmoreland filed a motion for appointment of counsel and for a stay of the proceedings. The next day, he moved to stay the proceedings in the district court pending an interlocutory appeal re-

garding the district court judge's refusal to recuse himself. Westmoreland's request for a stay was granted on February 18, but his appeal was dismissed the next day.

More than a year later, on April 26, 2004, Westmoreland filed a "Supplement to Statement of Facts, in Light of Additional Newly Discovered Facts." On May 12, 2004, August 18, 2004, and September 22, 2004, the government filed requests for extensions of time to respond to Westmoreland's pending motions. The record does not reflect whether the last of these requests was granted.

In the meantime, Westmoreland filed a motion for sanctions against the government, arguing that its continued delays had prejudiced him. He argued that the federal rules "are designed to promote justice and prevent delay," that "[a]ny further delay will be highly prejudicial to Westmoreland," and that he "has been and is being severely prejudiced by the United States' behavior in this case and Rule 11 sanctions should be imposed on the United States accordingly."

The government ultimately filed its response to Westmoreland's new trial motion on September 29, 2004. Westmoreland filed his reply on December 1. On December 7, 2004, Westmoreland supplemented his pleadings with excerpts from the administrative hearing transcripts related to the Illinois State Police Department investigation into the Milkovich affair with Bronnie Westmoreland.

By 2008, however, the district court had not ruled on any of the pending motions. In February of that year, Westmoreland filed a "Motion for Determination of

Status on Defendant's Rule 33 Motion." Still, nothing happened. At long last, the district court denied Westmoreland's motion for a new trial and his motions to appoint counsel on December 13, 2010 — more than eight years after his original motion and six years after the government's response. The district court's denial addressed the substance of Westmoreland's motions but did not comment on or explain this extended delay.

Westmoreland argues that the district court's delay in ruling on his motion for a new trial violated the Sixth Amendment's promise of "the right to a speedy and public trial." Both the accused and society as a whole have an interest in prompt resolution of criminal proceedings. See *Barker v. Wingo*, 407 U.S. 514, 519-20 (1972). Faded memories and lost evidence may impair a defendant's ability to defend himself if too much time passes between the accusation and the trial. See *id.* at 521. Delay may also exacerbate a defendant's anxiety and unnecessarily drain a defendant's financial resources. See *Moore v. Arizona*, 414 U.S. 25, 27 (1973).

Our cases, however, have not addressed whether the right to a speedy trial attaches to a post-trial motion for new trial. The Tenth Circuit, in *United States v. Yehling*, 456 F.3d 1236, 1243 (10th Cir. 2006), reasoned that because concerns calling for a speedy trial also apply to motions for a new trial based on newly discovered evidence, it would apply the speedy trial analysis. In doing so, it held that a four-year delay in denying a motion for a new trial did not violate the Sixth Amendment. We need not decide whether we

agree with the Tenth Circuit that the speedy trial right attaches to a motion for a new trial. Even if we assume that the right attached, Westmoreland cannot show that such a right was violated.

A Sixth Amendment speedy trial claim turns on the following general factors: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651 (1992); see also *United States v. White*, 443 F.3d 582, 589 (7th Cir. 2006). Although Westmoreland is able to satisfy some of the factors with respect to his motion for a new trial, he cannot show prejudice — which, because he was convicted, must be "substantial" and "demonstrable." *Yehling*, 456 F.3d at 1245, quoting *Perez v. Sullivan*, 793 F.2d 249, 256 (10th Cir. 1986). This claim therefore fails.

The first factor, an uncommonly long delay, "is not so much a factor as it is a threshold requirement." *United States v. Loera*, 565 F.3d 406, 412 (7th Cir. 2009). Delays approaching one year are "presumptively prejudicial," *White*, 443 F.3d at 589-90, and the district court's delay here was uncommonly long. We recognize that district courts face challenging caseloads and that some reasonable delays are inevitable. In this case, however, the district court failed to take any substantive action on Westmoreland's motion for eight years and has offered no explanation for its delay. This delay was plainly ex-

cessive and, on this record, unexplained. We are unable to discern a reason for it from the post-verdict docket in this case, which does not appear to be unusually busy or complex. We also cannot rely on the district court's explanation, for the court gave none. Without more, though, even this unacceptably excessive delay is not sufficient to establish prejudice and to require that the murder convictions be set aside.

When we analyze the prejudice element of a constitutional speedy trial claim, we ordinarily weigh three interests: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. See *Barker*, 407 U.S. at 532. When Westmoreland filed his motion for a new trial he had already been convicted of a successful conspiracy to commit murder and had been sentenced to serve the rest of his life in prison. When the district court finally reviewed his motion for new trial, it found that the motion had no merit, a finding with which we agree.

Given this posture, we must reject Westmoreland's arguments. He argues that he was prejudiced by the eight years that he suffered anxiety and worry while waiting for resolution of his motion for new trial. But Westmoreland's motion for new trial did not challenge his conviction and concurrent 240 month sentence for the drug conspiracy. Thus, while he waited for a ruling on his motion for new trial, he was not incarcerated any longer than he would have been otherwise, and we are not persuaded that any additional anxiety or worry because of the district court's delayed ruling requires

that he be exonerated for the murder. Once he was convicted and sentenced and his conviction and sentence had been affirmed on appeal, his incarceration and any resulting anxiety or worry resulted from his crimes, not from delay in deciding his motion for a new trial.

Westmoreland also argues that he was prejudiced by the delay because it became difficult to preserve documentary evidence and witness testimony over that time, and that while he waited for his ruling, his co-defendant (Abeln) committed suicide. Again, Westmoreland had been convicted and his convictions affirmed. His trial defense had not been impaired. Abeln's later suicide did not affect Westmoreland's post-conviction proceedings. Westmoreland does not suggest that if Abeln had lived, he would have recanted his inculpatory trial testimony or would have provided any other exculpatory evidence. The arguments raised in the motion for a new trial regarding new evidence lacked merit. Westmoreland was not prejudiced by his inability to preserve evidence to support a meritless motion. While we do not condone the delay, without a showing of prejudice the wait Westmoreland endured while his motion for a new trial was pending could not have amounted to a violation of his Sixth Amendment right to a speedy trial warranting dismissal of the charges on which he was convicted.

B. *Right to Counsel*

Finally, Westmoreland argues that he should receive a new trial because his right to counsel was violated. Westmoreland was represented by counsel in his direct

appeal. While that appeal was pending he filed his pro se motion for a new trial. The document that was filed, although filed with the district court as a new trial motion and treated as such, was captioned to be filed in this court as a "Pro Se Supplemental Brief" to Westmoreland's direct appeal.

The record reveals that Westmoreland wanted his lawyer to present the arguments within his "Pro Se Supplemental Brief" on direct appeal, but his lawyer refused. Instead, his attorney submitted Westmoreland's motion to the district court, but did so only as a "courtesy" to Westmoreland. See Dkt. 890 at i (Motion for New Trial, styled as "Pro Se Supplemental Brief" to Westmoreland's direct appeal) ("The issues presented herein are based on newly discovered evidence that is worthy of this Court's attention and review. However, the Defendant/Appellant's court appointed counsel . . . refuses to present these issues to this Court for review."); Dkt. 899 Ex. A (counsel's cover letter to court), Ex. B (Westmoreland's letter to counsel) ("I am requesting (as I did in July) that you file a [motion for new trial] based on the newly discovered evidence that I sent you in July 2002. I am entitled to effective assistance of counsel to present these claims upon newly discovered evidence and therefore, I am asking you to take notice of this constitutionally protected right consistent with current 7th Circuit precedent per *Kitchen v. United States*, 227 F.3d 1014 (7th Cir. 2000).").

While his motion for a new trial was pending, Westmoreland filed two motions for appointment of counsel. He filed his first on February 4, 2003. He

renewed that motion on December 2, 2004, noting in his filing that "[t]his case is getting more and more complicated and difficult for Defendant to manage," and stating "[a]s this Court is aware, Defendant suffers mental impairment [sic] and is relying solely on 'jail-house lawyers' and family to proceed with the investigation and manage the litigation. Defendant is incompetent to do so alone." The district court denied these requests without comment when it denied Westmoreland's motion for a new trial. See *Westmoreland*, 2010 WL 5141770, at *7. Westmoreland contends that the district court's denial violated his Sixth Amendment right to counsel. He asserts that because he was denied counsel for his new trial motion, he should be granted a new trial. Although we agree that Westmoreland's right to counsel attached to his motion, we conclude that the district court did not violate that right.

As Westmoreland noted in his letter to his lawyer, this situation is similar to that presented in *Kitchen v. United States*, 227 F.3d 1014 (7th Cir. 2000). Kitchen filed a motion for new trial while his direct appeal was pending, presenting evidence that he argued was newly discovered. Unlike this case, though, Kitchen's appeal was stayed while his motion for new trial was decided. When his new trial motion was denied, his counsel neglected to file a notice of appeal from the denial, precluding appellate review. Kitchen then filed a motion under 28 U.S.C. § 2255 arguing that he had been denied his right to effective assistance of counsel when his trial/appellate counsel failed to file a notice of appeal from the denial of his motion for a new trial. *Id*. at 1017.

We faced the following questions: (1) whether Kitchen had a right to counsel for his pre-appeal motion for a new trial; (2) whether his counsel's failure to file a notice of appeal was deficient performance; and (3) whether Kitchen was entitled to a presumption of prejudice or, if not, whether he had shown prejudice. *Id*.

Addressing the first issue, we held that Kitchen had a right to counsel for his pre-appeal motion for a new trial. The Sixth Amendment right to counsel extends to all "trial-like confrontations" connected to a criminal prosecution. See *United States v. Ash*, 413 U.S. 300, 311-12 (1973); *Kitchen*, 227 F.3d at 1018 ("[O]nce a defendant's right to counsel attaches, the right continues to apply 'at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected.' "), quoting *Mempa v. Rhay*, 389 U.S. 128, 134 (1967). A criminal defendant has the right to counsel through his first appeal of right, but once that appeal has been decided, the right no longer applies. See *Kitchen*, 227 F.3d at 1018, citing *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Ross v. Moffitt*, 417 U.S. 600, 607 (1974). Because Kitchen's motion was filed after the criminal proceedings had been initiated against him but before his direct appeal had been decided, we held that his right to counsel attached to his motion for a new trial. See *Kitchen*, 227 F.3d at 1018-19. Westmoreland also filed his motion after criminal proceedings against him had been initiated but before his direct appeal was decided. Thus, like Kitchen, Westmoreland had a right to counsel for his motion for new trial.

But the analysis does not end there. Yes, Westmoreland had a right to counsel, but *Westmoreland had counsel*. He asked his counsel to represent him in his pursuit of a new trial, but his counsel refused. It is well established that a defendant's right to counsel does not give him a right to force his counsel to make every possible nonfrivolous argument that could be made on his behalf. See *Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("Neither *Anders* [*v. California*, 386 U.S. 738 (1967)] nor any other decision of this Court suggests . . . a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points.").

Westmoreland's argument therefore is better understood not in terms of a denial of counsel but as an argument that his counsel's refusal to pursue the arguments in his motion for a new trial amounted to ineffective assistance of counsel. The fact that Westmoreland's arguments, when they were heard, were heard as part of his pro se motion for a new trial does not permit him to reframe an ineffective assistance of counsel claim as a complete denial of counsel. Thus, to prevail, Westmoreland must satisfy the requirements of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under *Strickland*, Westmoreland must show that his counsel's performance was deficient, meaning that it was unreasonable under prevailing professional norms. If he could make that showing, he would also have to show that he was prejudiced by the deficiency.

Though the record is not well developed on this point, we doubt that Westmoreland's counsel's decision

to refuse to pursue Westmoreland's arguments in favor of a new trial was anything other than a reasonable strategic choice. But even if Westmoreland were somehow able to overcome that hurdle, he has not shown prejudice. His argument is that he was prejudiced because his motion for new trial had merit. Those arguments have now been developed on appeal by highly capable appointed counsel. We have examined those arguments and affirm the district court in finding that a new trial was not warranted. Without a meritorious argument for a new trial, Westmoreland cannot show prejudice, and without prejudice, he cannot show that his counsel's performance was deficient in refusing to present his arguments. Accordingly, whether fashioned as an ineffective assistance of counsel claim or as a right to counsel claim, his claim still fails.

AFFIRMED.