In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2439

TRACY CONLEY,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-07122 — **Sharon Johnson Coleman**, *Judge.*

ARGUED MAY 26, 2021 — DECIDED JULY 21, 2021

Before EASTERBROOK, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Tracy Conley has invoked 28 U.S.C. § 2255 to vacate convictions arising from his participation in a "fake stash house" sting orchestrated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Conley asserts that his convictions were obtained unlawfully through racially selective law enforcement and outrageous government conduct, in violation of his Fifth Amendment equal

protection and due process rights, respectively. The district court denied Conley's motion, and we affirm. We disagree with the district court's decision to require "clear and convincing" evidence for Conley's selective enforcement claim, but his evidence cannot meet even the less-demanding standard of preponderance of the evidence. This circuit has not recognized a defense for "outrageous government conduct," and even if we did, ATF's conduct in Conley's case would not satisfy the standard other circuits have applied. Regardless of the wisdom of this fake stash house sting, it did not violate Conley's constitutional rights.

I.   *Background*

Our opinion affirming Conley's convictions on direct appeal sets out the facts of his case. *United States v. Conley*, 875 F.3d 391 (7th Cir. 2017). Here we focus on the facts relevant to his selective enforcement and outrageous conduct theories. On November 1, 2011, Conley found himself stranded at a gas station without money for gas. There he ran into three acquaintances—Anthony Adams, David Flowers, and Anwar Trapp—who successfully recruited Conley to help rob a cocaine stash house later that day. Adams, David, and Trapp had themselves been recruited recently for the robbery by David's brother, Myreon Flowers.

Myreon had been tipped off a week earlier about the supposed stash house by a man claiming to be a disgruntled courier for a drug cartel. The courier told Myreon that the stash house contained fifty kilograms of cocaine, and that to steal it, Myreon should assemble an armed team to overpower the cartel guards. Myreon jumped at the opportunity, bragging about how easy the robbery would be compared to others he had pulled off. Myreon quickly assembled a crew, recruiting

his brother David Flowers and their cousins Anwar Trapp and Dwayne Jones. David also recruited Anthony Adams, who in turn suggested recruiting Conley.

The supposed cartel courier was an undercover ATF agent. There was no stash house or real drugs, just a convincing ruse designed to ensnare Myreon and his crew in a conspiracy to steal fifty kilograms of cocaine at gunpoint. It turns out the FBI had originally focused on Myreon through an investigation into the Belizean Bloods, a Chicago street gang. Confidential sources had told the FBI that Myreon was an active member of a Belizean Bloods armed robbery crew, as well as a murder suspect. Based on that information, the FBI had referred Myreon to the ATF as a potential target for a stash house sting, and the ATF obliged.

On November 1, Myreon's group, including Conley, met in Adams's basement to plan the robbery. Conley not only agreed to participate but volunteered for a frontline role as one of two armed robbers who would confront the guards and steal the cocaine. Conley even asked the group whether they should kill the cartel courier (i.e., the undercover agent) but fortunately was told not to harm him. Later that day, the group met the undercover agent at a secluded parking lot near the supposed stash house. Conley and the others were dressed in dark clothing, wearing latex gloves, and equipped with walkie-talkies and a toolbox containing three guns for the robbery. Myreon told Conley, Adams, and another member to get into a van that would take them to the stash house for the robbery. As soon as they were all in the van, the undercover agent gave the arrest signal.

A jury convicted Conley of conspiring and attempting to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; possessing a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A); and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The district court sentenced Conley to fifteen years in prison, which included a ten-year mandatory minimum based on the large amount of non-existent drugs he agreed to steal—an amount the ATF made up just to trigger that ten-year minimum.

On direct appeal, we affirmed the denial of Conley's motion for acquittal. *United States v. Conley*, 875 F.3d 391 (7th Cir. 2017). We found that sufficient evidence supported his convictions, *id.* at 397–402, and that he could not argue entrapment because the ATF recruited neither Conley nor those who recruited him. *Id.* at 402.

Conley then filed his § 2255 motion in the district court seeking to set aside his convictions on two new grounds. First, he asserts that federal agents intentionally targeted him for the sting because he is Black, in violation of the equal protection component of the Fifth Amendment. Second, Conley asserts that even though he cannot show entrapment, the ATF's conduct in executing this fake stash house sting was so outrageous that prosecuting him violated his due process rights. The district court denied Conley's § 2255 motion but granted a certificate of appealability on both claims. *Conley v. United States*, No. 18 C 7122, 2020 WL 4226676, at *8 (N.D. Ill. July 23, 2020).

Judge Coleman denied Conley's selective-enforcement claim by relying exclusively on then-Chief Judge Castillo's

denial of a nearly identical claim brought by fake stash house defendants in *United States v. Brown*, 299 F. Supp. 3d 976 (N.D. Ill. 2018). See *Conley*, 2020 WL 4226676, at *4–6. Judge Coleman certified the issue for appeal, however, "based on the uncertainty of the applicable evidentiary standard" governing a selective-enforcement claim in this circuit. *Id.* at *6. As for outrageous government conduct, Judge Coleman denied Conley's claim because this circuit has repeatedly rejected the existence of such a defense. *Id.* at *3–4. Again, however, Judge Coleman certified Conley's appeal on this issue: "If there ever was a situation in which the conduct of law enforcement agents was so outrageous that a criminal defendant's due process rights have been violated, this is it." *Id.* at *4.

While this appeal was pending, Judge Coleman granted Conley's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Conley's release from prison does not remove our jurisdiction over his § 2255 motion or render it moot. A movant under § 2255 must be "in custody." 28 U.S.C. § 2255(a). But Conley "was in custody when he filed [his] motion" for § 2255 relief, "and that is all that is required…." *Torzala v. United States*, 545 F.3d 517, 521 (7th Cir. 2008), citing *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). Moreover, despite his release from prison, Conley is still subject to a three-year term of supervised release, which is "a form of custody," *Clarke v. United States*, 703 F.3d 1098, 1101 (7th Cir. 2013), and carries collateral consequences sufficient to prevent his motion from being moot. See *Spencer*, 523 U.S. at 7 ("An incarcerated convict's (*or a parolee's*) challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration (*or the restriction imposed by the terms of the parole*) constitutes a concrete injury, caused by the conviction

and redressable by invalidation of the conviction.") (emphases added).

## II. *Controversy Surrounding Fake Stash House Stings*

Before turning to the merits, we provide some background on the ATF's controversial and now-abandoned practice of conducting fake stash house stings in Chicago. As we noted in Conley's direct appeal, there is a "substantial body of criticism of similar stash house cases both from this circuit and others." *Conley*, 875 F.3d at 402. We have described the tactic as "'tawdry,' noting in particular how these operations are 'directed at unsophisticated, and perhaps desperate defendants' like Conley who easily take the all-too-tempting bait put out for them by the government." *Id.* at 402–03, quoting *United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011).

These stings are troubling in several ways. First, the agents in these stings blindly encourage the initial target to rope in a large group of co-conspirators who otherwise may have stayed out of trouble. See *United States v. Washington*, 869 F.3d 193, 225 (3d Cir. 2017) (McKee, J., dissenting) (defendant "was not even the intended target of this operation. Despite his criminal past, [he] was not necessarily destined to commit future crimes…. 'we don't want the government pushing [criminals] back into a life of crime.'"), quoting *United States v. Kindle*, 698 F.3d 401, 415–16 (7th Cir. 2012) (Posner, J., dissenting), on reh'g en banc sub nom. *United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014).

Second, the vast majority of defendants caught in these stings have been poor people of color. See *Brown*, 299 F. Supp. 3d at 986 ("These sting operations have used tremendous public resources to investigate and prosecute a large number

of principally minority individuals for fictitious crimes."); see also *United States v. Black*, 750 F.3d 1053, 1057 (9th Cir. 2014) (Reinhardt, J., dissenting from denial of rehearing en banc) ("In this era of mass incarceration, in which we already lock up more of our population than any other nation on Earth, it is especially curious that the government feels compelled to invent fake crimes and imprison people for long periods of time for agreeing to participate in them….").

Third, these stings give law enforcement free rein to manipulate sentences by setting imaginary drug amounts. See *United States v. Briggs*, 623 F.3d 724, 729–30 (9th Cir. 2010) (criticizing ability to manipulate sentences with fake drug amounts).

Fourth, economic analysis suggests that fake stash house stings may actually facilitate the illegal drug trade. They make real stash houses more secure by deterring potential robbers. See *Kindle*, 698 F.3d at 416 (Posner, J., dissenting) ("The operators of stash houses would *pay* law enforcement to sting potential stash house robbers."). These problems have led jurists to question whether fake stash house stings comport with "the pride we take in presenting American criminal justice as a system that treats defendants fairly and equally." *United States v. Flowers*, 712 F. App'x. 492, 511 (6th Cir. 2017) (Stranch, J., concurring).

Amid this controversy, many defendants in Chicago have challenged the ATF's fake stash house stings as racially selective. Sitting en banc in 2015, we laid out principles for granting discovery in these cases. *United States v. Davis*, 793 F.3d 712, 719–23 (7th Cir. 2015) (en banc). Various stash house cases then progressed on different timelines. In December 2017, the matter culminated in a unique two-day evidentiary hearing

in the Northern District of Illinois before nine district judges presiding over twelve similar stash house cases. Statistical experts testified to whether the ATF's fake stash house program was racially discriminatory. See *Brown*, 299 F. Supp. 3d at 993.

Following that hearing, Judge Castillo issued a careful opinion denying defendants' selective-enforcement claims due to flaws and limits in the statistical analysis performed by the court's appointed expert, Columbia University Law Professor Jeffrey Fagan. *Id.* at 1001–13. The opinion criticized the ATF's fake stash house stings as a matter of policy, *id.* at 984–85, and it took pains to clarify that the court was not deciding whether these stings "are honorable or fair," but only "whether law enforcement agents violated the Due Process Clause of the Fifth Amendment in pursuing these investigations." *Id.* at 986.

This history forms the backdrop of Conley's appeal. In particular, Judge Castillo's analysis in *Brown* is critical here because Conley relies on the statistics in the Fagan Report to prove his selective-enforcement claim. We now turn to the merits of that claim.

III. *Selective Enforcement*

Conley asserts that the ATF targeted him for the sting because he is Black. Conley did not raise this selective-enforcement claim until his § 2255 motion. But we may consider it because, as the district court noted, the government chose not to raise procedural default as a defense to this claim. See *Perrone v. United States*, 889 F.3d 898, 904 (7th Cir. 2018) ("Procedural default is a waivable defense.").

Because Conley himself was not the initial target of the sting, his theory is that the ATF first targeted Myreon Flowers

because of his race, with further hopes that Myreon would recruit other Black people like Conley as co-conspirators. If proven, that would amount to purposeful discrimination in violation of the Fifth Amendment's equal protection component. See *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race.... [T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause."); *Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir. 2001) (same).[1]

Racially selective law enforcement is a quintessential equal protection violation. One of the Supreme Court's earliest equal protection opinions granted habeas corpus relief to petitioners who alleged selective enforcement of building codes against Chinese-owned laundries in San Francisco. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). The *Yick Wo* petitioners showed that authorities had denied the applications of two hundred Chinese people for permits to operate laundries in wooden buildings but granted the applications of eighty non-Chinese people "under similar conditions." *Id.* at 374. The Court made clear that, in such a situation, law enforcement can be "directed so exclusively against a particular class of persons … with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to the petitioners … by the broad and benign provisions of the fourteenth

---

[1] The Equal Protection Clause of the Fourteenth Amendment applies only to the States, but it has been "reverse-incorporated" to apply to the federal government as a component of the Fifth Amendment's Due Process Clause. *Bolling v. Sharpe*, 347 U.S. 497, 498–500 (1954) (racially segregated public schools in District of Columbia violated Fifth Amendment).

amendment…." *Id.* at 373. Today, *Yick Wo* is seen as providing historical roots not only for selective enforcement claims but also for selective-prosecution claims. See *United States v. Armstrong*, 517 U.S. 456, 464–66 (1996) (discussing *Yick Wo* as one source of selective-prosecution claims).

Selective prosecution occurs when, from among the pool of people referred by police, a prosecutor pursues similar cases differently based on race. Selective enforcement occurs when police investigate people of one race but not similarly-situated people of a different race. Hence, with selective enforcement, "the constitutional problem … precede[s] the prosecutor's role." *Davis*, 793 F.3d at 720. It does not matter if prosecutors then pursue each case equally because the pool of defendants itself was racially selected. *Id.*

As equal protection claims, both selective prosecution and selective enforcement require proof "that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez*, 251 F.3d at 635–36, citing *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272–74 (1979), *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–66 (1977), and *Washington v. Davis*, 426 U.S. 229, 239–42 (1976). A plaintiff must show discriminatory purpose "in *his* case." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). And discriminatory purpose "implies more than … awareness of consequences. It implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 298, quoting *Feeney*, 442 U.S. at 279.

A. *Standard of Proof*

The first issue we confront is the standard of proof Conley must meet to prove his selective-enforcement claim. The district court granted a certificate of appealability on this claim "because reasonable jurists could debate that his claim should have been resolved in a different manner based on the uncertainty of the applicable evidentiary standard." *Conley*, 2020 WL 4226676, at *6. We review this legal issue de novo. *Martin v. United States*, 789 F.3d 703, 705 (7th Cir. 2015). The government argues that Conley must meet the same "clear evidence" standard that governs selective-prosecution claims. See *Armstrong*, 517 U.S. at 465 ("In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'"), quoting *United States v. Chemical Foundation*, 272 U.S. 1, 14–15 (1926). Conley counters that the reasons for *Armstrong*'s clear-evidence standard are specific to prosecutors, so that selective-enforcement claims against police need be proven by only a preponderance of the evidence. The district court agreed with the government's view, as did Judge Castillo in *Brown*. We disagree, however, and hold that racially selective-enforcement claims must be proven by a preponderance of the evidence.

Our analysis proceeds as follows. First, in Part III-A-1, we explain *Armstrong*'s clear-evidence standard and why its rationale does not extend to selective-enforcement claims. In Part III-A-2, we explain why *McCleskey v. Kemp* does not require a heightened standard of proof. Finally, in Part III-A-3, we draw connections to other doctrines showing that a preponderance standard fits better into the broader legal landscape.

1.  *Armstrong Does Not Set the Standard of Proof*

a.  *Armstrong's Clear-Evidence Standard*

Equal protection claims generally must be proven by a preponderance of the evidence. See *Radentz v. Marion County*, 640 F.3d 754, 756 (7th Cir. 2011) (holding in § 1983 equal protection case that "plaintiffs first must demonstrate by a preponderance of the evidence that they were the victims of intentional discrimination"), citing *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003) ("the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection"); see also *Harris v. Arizona Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1307 (2016) (using "more probable than not" standard for equal protection redistricting claim); *Hunter v. Underwood*, 471 U.S. 222, 225 (1985) (citing with approval circuit court's statement that "plaintiffs must prove by a preponderance of the evidence that racial discrimination was a substantial or motivating factor").

Selective-prosecution claims, however, must be proven by "clear evidence." *Armstrong*, 517 U.S. at 465. In *Armstrong*, the Supreme Court reversed a grant of discovery in a selective-prosecution case despite evidence that "*every* defendant in *every* crack-cocaine prosecution filed by a particular United States Attorney's office and assigned to the public defender was black." *Davis*, 793 F.3d at 719. The Supreme Court held that, because a "selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive," the plaintiffs needed further evidence showing that comparators of another race were not prosecuted before a court could even order discovery against the prosecutor's office. *Armstrong*, 517 U.S. at 464, 468.

The Court derived that discovery requirement from a heightened "clear-evidence" standard governing the merits of a selective prosecution claim. *Id.* at 468 ("The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim."). *Armstrong*'s "clear-evidence" standard is based in turn on the need to preserve prosecutorial discretion and on the "presumption of regularity" that applies to federal prosecutors as officers of the Executive Branch:

> The Attorney General and United States Attorneys retain "'broad discretion'" to enforce the Nation's criminal laws. *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380, n. 11 (1982)). They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3; see 28 U.S.C. §§ 516, 547. As a result, "[t]he presumption of regularity supports" their prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15 (1926)….

> \* \* \*

> In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear

evidence to the contrary." *Chemical Foundation*, *supra*, at 14–15.

517 U.S. at 464–65.

>    b.  *Armstrong's Rationale Does Not Extend to Selective Enforcement*

The reasons underlying *Armstrong*'s clear-evidence standard for selective-prosecution claims simply do not extend to selective-enforcement claims brought against police. As the above passage shows, *Armstrong*'s "clear-evidence" standard invokes language from *Chemical Foundation*, a bedrock presumption-of-regularity case. The presumption of regularity is a deference doctrine that limits judicial scrutiny of procedures and motivations supporting certain Executive Branch decisions. The presumption is driven by separation-of-powers concerns, which increase as courts venture closer to core executive activity. The presumption has been applied to different degrees depending on "the Court's assessment of the relevant decisionmaking scheme across several dimensions: procedural fairness, accountability, and degree of discretion, as well as complexity…." Note, *The Presumption of Regularity in Judicial Review of the Executive Branch*, 131 Harv. L. Rev. 2431, 2432–33 (2018). The presumption of regularity is an analytic tool, not an excuse to rubberstamp any and all executive action as lawful absent clear evidence to the contrary.

In *Armstrong*, the court applied the presumption to prosecutorial decision-making. And in *Reno v. American-Arab Anti-Discrimination Committee*, the Court extended that logic to federal deportation decisions, which, like prosecutorial decisions, implicate core executive strategy that courts should not over-scrutinize. 525 U.S. 471, 490–91 (1999). The Court has not

extended the presumption of regularity, however, to street-level police investigations. Few police officers are high-level executive officers. And while their decisions certainly reflect law enforcement priorities, judicial inquiry into their motives is routine. We therefore see no persuasive reason to extend *Armstrong*'s heightened standard to selective-enforcement claims.

Our en banc opinion in *Davis* took this limited approach to *Armstrong*. Like this case, *Davis* arose in the context of a fake stash house sting. But the issue there concerned *Armstrong*'s discovery standard. The district court had granted broad discovery against the prosecutor's office, ATF, FBI, and others based on the fact that the prosecution had "brought at least twenty purported phony stash house cases, with the overwhelming majority of the defendants named being individuals of color." *Davis*, 793 F.3d at 719. The government argued that, under *Armstrong*, that was an insufficient showing of racial discrimination to authorize discovery.

We agreed with respect to discovery from the prosecutor's office, but we disagreed with respect to discovery from the ATF and FBI for selective enforcement because "the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution." *Id.* at 721. "*Armstrong* was about prosecutorial discretion," and unlike prosecutors, "Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior." *Id.* at 720. On the contrary, police officers are regularly called before courts to justify their tactics. *Id.* at 720–21. Accordingly, *Davis* found that

*Armstrong*'s requirement to show comparators before grant-ing discovery did not apply to the plaintiffs' selective-enforce-ment claims.

The government in this appeal asks us not to extend *Da-vis*'s reasoning when it comes to the standard of proof. But given that *Armstrong* imposed its "rigorous standard for dis-covery" only to match the correspondingly "rigorous stand-ard for the elements of a selective-prosecution claim," 517 U.S. at 468, the distinction we drew in *Davis* for discovery natu-rally extends to the standard of proof. Indeed, we recognized in *Chavez* that *Armstrong* does not govern at least one aspect of proving discriminatory effect in a selective-enforcement case. There, we affirmed summary judgment on a selective-enforcement claim on the merits without suggesting a stand-ard of proof higher than preponderance applied. Rather, we rejected plaintiffs' need to satisfy *Armstrong*'s burden to iden-tify comparators to prove discriminatory effect on the merits. We did so for the same reasons we rejected the need for com-parators at the discovery stage in *Davis*: "[T]he instant case involves police conduct, not prosecutorial discretion, and is in a civil, not criminal, context. This case is thus not like *Arm-strong*." *Chavez*, 251 F.3d at 640.

### 2. *McCleskey Did Not Set the Standard of Proof*

The government argues that *McCleskey v. Kemp*, 481 U.S. 279 (1987), provides an independent ground for applying a clear-evidence standard, one that relies on a distinction be-tween criminal and civil cases rather than a comparison be-tween police and prosecutors. This argument comes from a sweeping line of dicta in *McCleskey*: "Because discretion is es-sential to the criminal justice process, we would demand *ex-ceptionally clear proof* before we would infer that the discretion

has been abused." 481 U.S. at 297 (emphasis added). The government seems to argue that this language in *McCleskey* imposes a clear-and-convincing evidence standard on any claim that "challenges decisions at the heart of the State's criminal justice system." *Id.*

It appears the district court agreed with this broad reading of *McCleskey*. Judge Coleman denied Conley's selective-enforcement claim based on Judge Castillo's reasoning in *Brown*. And in *Brown*, Judge Castillo wrote that *McCleskey* "unfortunately" required him to extend *Armstrong*'s clear-evidence standard to selective-enforcement claims. *Brown*, 299 F. Supp. 3d at 996 & n.14. But *McCleskey* did not hold broadly that any constitutional claim challenging core criminal justice activity is subject to a heightened standard of proof. This is immediately apparent once one recognizes the many claims and defenses raised by accused defendants that are governed by a preponderance standard even though they challenge activity at the heart of the criminal process.

For instance, *Batson* claims for racially motivated peremptory challenges by prosecutors can be proven by a preponderance of the evidence. See *Johnson v. California*, 545 U.S. 162, 170 (2005) (at final step of *Batson* inquiry, judge must decide "whether it was more likely than not that the challenge was improperly motivated"). Likewise, when seeking to suppress evidence (a remedy that often leads to dismissal), accused defendants need prove by only a preponderance of evidence that police abused their investigative discretion in violation of the Fourth Amendment. See *Franks v. Delaware*, 438 U.S. 154, 156 (1978) (if "perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and … the affidavit's remaining content is insufficient to establish

probable cause, the search warrant must be voided and the fruits of the search excluded….”). See also Part III-A-3-c, below, noting other affirmative criminal defenses provable by a preponderance of evidence.

Accordingly, rather than reading this passage in *McCleskey* as announcing a broad new standard that would have implicitly unsettled many doctrines, we understand *McCleskey*'s call for "exceptionally clear proof" as part of the Court's criticism of the petitioner's insufficient statistics in that case. McCleskey asked the Court to infer intentional racial discrimination in his specific case from a broad statistical study showing that Georgia juries more readily imposed the death penalty on Black defendants. The Court thus noted that "McCleskey's statistical proffer must be viewed in the context of his challenge. McCleskey challenges decisions at the heart of the State's criminal justice system" that "necessarily require[] discretionary judgments." 481 U.S. at 297. Given that discretion, if McCleskey wished to rely solely on statewide statistics, they would need to be "exceptionally clear" to infer that his specific jury sentenced him to death because he was Black and not because of the "legitimate and unchallenged explanation for the decision"—that he committed a death-eligible murder. *Id*.

In other words, *McCleskey* clarified that, even under a preponderance standard, if "a legitimate and unchallenged explanation … is apparent from the record," it takes "exceptionally clear proof" in the other direction to push the case across the fifty-yard line. *Id. McCleskey* does not independently require a heightened standard of proof here simply because Conley challenges decisions made in the criminal justice system.

### 3.  *Support from Related Areas of Law*

Situating this issue within the larger fabric of the law fur-ther confirms that a preponderance standard should govern Conley's selective-enforcement claim. Specifically, the Su-preme Court's distinction between absolute prosecutorial im-munity and qualified immunity, its aversion to clear-evidence standards in civil cases, and its use of preponderance stand-ards for other criminal defenses all bolster the case for apply-ing a preponderance standard here.

### a.  *Civil Immunity for Prosecutors and Police*

To begin, the same reasons for treating selective enforce-ment differently than selective prosecution also justify the dif-ferent levels of immunity that apply to prosecutors and police in § 1983 and *Bivens* actions. Unlike police, prosecutors enjoy absolute civil immunity from damages for unconstitutional actions taken in their prosecutorial role. *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976). The primary justification for prosecu-torial immunity is that it preserves core executive discretion, just as in *Armstrong*: "A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecu-tor's office would suffer if he were constrained in making every decision by the consequences in terms of his own po-tential liability in a suit for damages." *Id.* at 424–25. On the other hand, when prosecutors conduct police-like activity outside their prosecutorial role, the rationale for absolute im-munity vanishes and they enjoy only qualified immunity, just like police officers. *Kalina v. Fletcher*, 522 U.S. 118, 126 (1997) ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'nei-ther appropriate nor justifiable that, for the same act,

immunity should protect the one and not the other.'"), quoting *Hampton v. City of Chicago*, 484 F.2d 602, 608 (7th Cir. 1973).

This reasoning is consistent with our view that *Armstrong*'s clear-evidence standard similarly should not extend to selective-enforcement claims, which challenge police investigations, not prosecutorial decisions. An accused defendant who secures release due to racially selective prosecution cannot then seek damages from the prosecutor. But a defendant who proves selective enforcement can sue the police. And in such a case, qualified immunity would likely not protect the police because the plaintiff has already proven racial animus. See *Taylor v. Ways*, 999 F.3d 478, 490 (7th Cir. 2021) ("Any reasonable official … would have known that intentional racial discrimination … was unconstitutional."). Since prosecutorial immunity and *Armstrong* both turn on similar, prosecutor-specific reasons, the stark gap in civil relief available in selective-prosecution cases versus selective-enforcement cases supports a similar gap in the standards for proving such claims in the criminal context.

> b. *Clear-and-Convincing Evidence Standard Disfavored in Civil Cases*

Habeas corpus cases like this are civil cases. See, e.g., *Banister v. Davis*, 140 S. Ct. 1698, 1705 (2020) ("The Federal Rules of Civil Procedure generally govern habeas proceedings."), citing Fed. Rule Civ. Proc. 81(a)(4); *Browder v. Director, Dep't of Corr. of Illinois*, 434 U.S. 257, 270 (1978) (analogizing habeas proceedings to "other civil proceedings"). And in civil cases, the Supreme Court has developed a presumption in favor of preserving preponderance standards in the face of attempts to impose "clear-and-convincing evidence" standards. See *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 777 (7th Cir. 2016)

(describing "'the presumption that the burden of proof in federal civil cases is proof by a preponderance of the evidence,' … a presumption reinforced by the Supreme Court's repeated rejection of more demanding evidentiary burdens in the civil setting"), quoting *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 507 (7th Cir. 2007). In rejecting a "clear-and-convincing" standard under Title VII, the Supreme Court has stressed that one of the "[c]onventional rules of civil litigation … is that parties … need only prove their case by a preponderance of the evidence." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 253 (1989).

Due to this presumption, the "imposition of even severe civil sanctions … has been permitted after proof by a preponderance of the evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389–90 (1983) (rejecting clear-and-convincing standard for securities fraud); accord, *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923, 1934 (2016) (same for enhanced patent damages under 35 U.S.C. § 284); *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 557–58 (2014) (same for patent fee-shifting under 35 U.S.C. § 285); *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) (same for bankruptcy discharges); *United States v. Regan*, 232 U.S. 37, 48–49 (1914) (preponderance standard suffices in civil suits for acts exposing party to criminal prosecution); *Ramirez*, 845 F.3d at 776–80 (conduct supporting dismissal of civil case as sanction need be proven by only a preponderance of evidence).

"Exceptions to this standard are uncommon, and in fact are ordinarily recognized only when the government seeks to take unusual coercive action … against an individual." *Price Waterhouse*, 490 U.S. at 253, citing *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (clear and convincing evidence needed to

terminate parental rights); *Addington v. Texas*, 441 U.S. 418, 427 (1979) (same for involuntary commitment); *Woodby v. INS*, 385 U.S. 276, 285 (1966) (same for deportation); *Schneiderman v. United States*, 320 U.S. 118, 122, 125 (1943) (same for denaturalization).

Here we have the opposite situation. The government seeks a clear-evidence standard to protect its interest in continuing severe coercive action (imprisonment) against an individual. Viewed through that lens, granting a writ of habeas corpus that tells a federal official to refrain from unconstitutionally imprisoning someone is not the sort of relief calling for a heightened standard of proof for the benefit of the government. If anything, the Court's pattern of departing from the preponderance presumption only to protect individuals from serious government action points in the opposite direction.[2]

The purpose of selecting a standard of proof is "to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Herman & MacLean*, 459 U.S. at 389, quoting *Addington*, 441 U.S. at 423. Applying a clear-evidence standard here would inappropriately "express[] a preference for one side's interests" in a case where equally powerful considerations weigh on both sides. *Id.* at 390. For the government, concerns about finality and separation of powers caution against disturbing a federal conviction obtained after a full trial in the district court, on an

---

[2] We address here the standard of proof in first federal motions under 28 U.S.C. § 2255, not the deferential standard of review that usually applies when federal courts review state convictions under 28 U.S.C. § 2254, nor the standard for successive § 2255 petitions under § 2255(h).

indictment brought by executive law enforcement agencies. But for the accused defendant, the preservation of individual constitutional rights weighs equally in favor of substantial post-conviction review. Accordingly, the Supreme Court has agreed at least in one context that a petitioner's claim for habeas relief from a federal conviction can be proven by a preponderance of the evidence. See *Walker v. Johnston*, 312 U.S. 275, 286 (1941) (petitioner alleging deprivation of constitutional right to counsel "would have the burden of sustaining his allegations by a preponderance of evidence"). Absent the additional prosecutorial concerns that motivated *Armstrong*'s heightened standard, there is a "balance of interests" here that "warrants use of the preponderance standard … generally applicable in civil actions." *Herman & MacLean*, 459 U.S. at 390.[3]

### c. *Preponderance Standards Govern Other Affirmative Criminal Defenses*

Even in criminal cases, many affirmative defenses are provable by a preponderance of the evidence. See, e.g., *Dixon v. United States*, 548 U.S. 1, 17 (2006) (duress defense); *Cooper v. Oklahoma*, 517 U.S. 348, 355–56 (1996) (government cannot prosecute if defendant shows he is "more likely than not" incompetent). Even the way the entrapment defense operates in fake stash house cases like this one shows defendants need

---

[3] Even if we thought that habeas corpus relief might call for a higher standard of proof than a run-of-the-mill § 1983 claim for civil damages, that approach would produce an awkward tension under *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck*, a higher standard of proof in criminal appeals and habeas corpus cases would in practice mean a higher standard for ordinary civil relief too because convicted defendants must have their convictions invalidated before they can bring selective enforcement claims for damages. See *id.* at 486–87.

not present "clear" evidence to prove their defenses. Rather, so long as the defendant puts forth enough evidence to show that a reasonable jury could find he was entrapped, the judge must submit the defense to the jury with an instruction that, to convict, the jury must find beyond a reasonable doubt that the defendant was *not* entrapped. *Jacobson v. United States*, 503 U.S. 540, 549 (1992); *United States v. Pillado*, 656 F.3d 754, 763 (7th Cir. 2011). So, given that accused defendants can secure release through other affirmative defenses that use preponderance standards (or standards even more favorable to defendants), there should be no concern about applying a preponderance standard to Conley's selective enforcement defense. For these reasons, we hold that Conley could prove his selective enforcement claim by a preponderance of the evidence.[4]

---

[4] We have considered whether applying a preponderance standard creates a circuit split requiring circulation under Circuit Rule 40(e), but conclude it does not. To be sure, the Third, Fourth, Sixth, and Tenth Circuits have cited *Armstrong*'s clear-evidence standard when assessing selective-enforcement claims. See *Karns v. Shanahan*, 879 F.3d 504, 521 (3d Cir. 2018); *United States v. Mason*, 774 F.3d 824, 829–30 (4th Cir. 2014); *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000); *United States v. Hernandez-Chaparro*, 357 F. App'x 165, 166 (10th Cir. 2009). These cases, however, invoked *Armstrong* in passing without specifically rejecting a preponderance standard. Moreover, the rule in the Sixth and Tenth Circuits remains unclear because other cases there have applied a preponderance standard. See *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997) ("[A] defendant would have to demonstrate by a 'preponderance of the evidence' that a police officer decided to approach [or pursue] him or her solely because of his or her race."), quoting *United States v. Travis*, 62 F.3d 170, 174 (6th Cir. 1995); *York v. Sec'y of Treasury*, 774 F.2d 417, 422 (10th Cir. 1985); *Barton v. Malley*, 626 F.2d 151, 155 (10th Cir. 1980). Regardless, we also view our decision here as simply reaffirming the logic of *Davis*, where

B.  *Application*

In granting a certificate of appealability on Conley's selective-enforcement claim, the district court wrote that his claim may have "been resolved in a different manner" under a preponderance standard. See *Conley*, 2020 WL 4226676, at *6. We respectfully disagree, however, and find it unnecessary to remand for new analysis under the preponderance standard. The parties have briefed the issue, and Conley's key evidence—the Fagan Report—has already been thoroughly dissected in *Brown*. It is clear on this record that particular aspects of Conley's individual case prevent him from relying on the Fagan Report to prove, even by a preponderance of the evidence, that the ATF targeted him based on race.[5]

As a general matter, statistics can be "a useful tool" that can establish discriminatory effect and provide powerful evidence of discriminatory intent if race can be isolated from other confounding variables. E.g., *United States v. Barlow*, 310 F.3d 1007, 1011 (7th Cir. 2002). While few judges are statisticians, we are tasked with determining whether discrimination was afoot, and statistics can be important in that determination. Judges must therefore pay close attention to what parties' statistics can and cannot prove. When program-wide statistics are the plaintiff's sole source of evidence, it can be

---

we have already held en banc that *Armstrong* does not apply in the selective enforcement context. See 793 F.3d at 720–22.

[5] Beyond the Fagan Report, Conley's only other evidence of discrimination is comments made by two ATF agents who were not involved in Conley's sting. These comments made by other agents in other stings are of little relevance here. They were thoroughly analyzed in *Brown* and found to be insufficient evidence of discriminatory intent. See 299 F. Supp. 3d at 1014–18. We agree with *Brown*'s analysis of these comments.

difficult to infer discrimination in a particular case—especially where there is another legitimate explanation for the government's conduct. See *McCleskey*, 481 U.S. at 293 n.12 (only in "rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation"). Still, we must be willing to follow statistics where they fairly lead without fear that they could require "too much justice." *McCleskey*, 481 U.S. at 339 (Brennan, J., dissenting).

Conley's statistics cannot pass muster, even under a preponderance standard. In 2014, Professor Fagan was appointed by the court in *Brown* to conduct a statistical analysis of whether the federal government's fake stash house program in Chicago was racially selective. 299 F. Supp. 3d at 992. In 2016, Professor Fagan issued a comprehensive report explaining his findings. The Fagan Report concluded that, even "after controlling for criminal propensity, race remains statistically significant, meaning that the ATF is selecting defendants on the basis of race." *Id.* at 1003. Judge Castillo, however, found that there were "fundamental concerns about the reliability of Professor Fagan's findings" that prevented a showing of discriminatory effect or intent. *Id.* at 1013.

At least with respect to Conley's case, we agree. No Chicago stash house case is more susceptible to the limits of the Fagan Report. Two critical limits in Professor Fagan's analysis apply here. His statistical finding of discrimination depends on the assumptions that (1) law enforcement officers (not coconspirators), and (2) the ATF Chicago office (not other agencies) independently selected each stash house defendant. Conley was not selected by law enforcement at all, let alone by the ATF. He was brought in by other conspirators who were themselves chosen by the initial target, Myreon Flowers.

And Chicago ATF did not even select Myreon Flowers; the FBI did. These gaps undermine Conley's ability to rely on the Fagan Report. As Judge Castillo explained in *Brown*:

> Critical to Professor Fagan's entire analysis [is] an assumption that the ATF selected *each* of the 94 stash house defendants for participation in the stings….
>
> As a *factual* matter, the bulk of the 94 defendants were not recruited by ATF. Instead, the record reflects that the stash house investigations began with the ATF's selection of one or more initial targets…. The remaining defendants were recruited by the targets themselves, or by other members of the conspiracy who were, in turn, recruited by the targets. In fact, the record reflects that the ATF never even met 32 of the 94 defendants—nearly one-third of the total defendant group—until the day of their arrest. Additionally, two of the stash house cases, involving a total of 14 defendants, were not initiated by the ATF at all. Instead, those investigations were initiated by the Federal Bureau of Investigation ("FBI") based on information provided by its own confidential informants. The record reflects that the ATF did not become involved in these two cases until *after* the selection of the initial targets had already been made. In the Court's view, ATF cannot be said to have "selected" individuals it never met or individuals targeted by another governmental agency under any ordinary meaning of that term.

299 F. Supp. 3d at 1003–04 (footnotes and citations omitted).

Conley is one of the thirty-two defendants who were se-lected by co-conspirators and whose race law enforcement did not know until his arrest. And the larger Flowers sting of which Conley was a part was one of the two initiated by the FBI, not the ATF. Moreover, the FBI individually targeted Myreon Flowers based on his current armed robbery activity, not based on the ATF criteria that Professor Fagan used to construct the comparison group for his analysis. The Fagan Report's inference of discrimination, whatever strength it might have in other cases, is therefore based on two assump-tions that simply do not apply to Conley's case. Professor Fa-gan himself acknowledged that correcting for those assump-tions would reduce the data to "such a small sample" that it would be nearly "impossible to conduct a reliable statistical analysis" that could support an inference of racial discrimina-tion. 299 F. Supp. 3d at 1008.

These two inapplicable assumptions undermine the pro-bative value of the Fagan Report's conclusions as applied to Conley's case. We thus do not need to review arguments over other problems with the report that Judge Castillo discussed in *Brown*, such as the use of predominantly white LaSalle County in the comparison pool. See *id.* at 1009–13. Absent ad-ditional evidence showing that the FBI would not have re-ferred (or the ATF would not have then pursued) a white tar-get situated similarly to Flowers, we could not conclude that, more likely than not, the government targeted Flowers based on his race. And even if we assume that Flowers was racially targeted, to extend the reasoning to Conley we would need to find further that the ATF affirmatively hoped Flowers would recruit other Black people as co-conspirators. When agents

targeted Flowers, they were surely aware that, given the continued patterns of social and neighborhood segregation in Chicago, his chosen co-conspirators would likely include other Black people. See, e.g., Matthew Bloch, Amanda Cox & Tom Giratikanon, *Mapping Segregation*, N.Y. Times (July 8, 2015), https://www.nytimes.com/interactive/ 2015/07/08/us/census-race-map.html (click on Chicago). Yet the "awareness" of that likely consequence does not prove purposeful discrimination, *Feeney*, 442 U.S. at 279, and Conley lacks any other evidence indicating that the ATF affirmatively intended Flowers to recruit Black co-conspirators like Conley. These problems "cannot be brushed aside simply because of an underlying discomfort with" fake stash house stings. 299 F. Supp. 3d at 1013.

In deciding this appeal, we have not forgotten the long history of race in America and in the Chicago region and the many aspects of that history that contribute to the fact that "between 2006 and 2013, the defendants prosecuted in the ATF false stash house cases in this District were 78.7 percent black, 9.6 percent Hispanic, and 11.7 percent white." *Id.* at 1001. But the Equal Protection Clause and its federal Fifth Amendment corollary provide legal relief only when a party can prove purposeful discrimination against him by the government in his case. Our inquiry here is limited to whether Conley has offered evidence that would support a finding that it is more likely than not that federal law enforcement agencies intentionally targeted him for this sting because he is Black. It does not, despite the district court's suggestion to the contrary. So we must affirm dismissal of his selective-enforcement claim.

IV. *Outrageous Government Conduct*

Conley's second claim for relief under § 2255 is that ATF's fake stash house sting was so outrageous that it violated his due process rights. This argument, known as the "outrageous government conduct" defense, stems from an entrapment case where the Supreme Court suggested that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973). But the Supreme Court has never reversed criminal charges due to outrageous government conduct, and neither have we.[6]

This defense fails for three reasons. First, we have repeatedly rejected the existence of an outrageous conduct defense. See *United States v. Westmoreland*, 712 F.3d 1066, 1071 (7th Cir. 2013) ("[O]ur court has disallowed such a defense."); *United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011) ("Outrageous government conduct is not a defense in this circuit."); *United States v. White*, 519 F.3d 342, 346 (7th Cir. 2008) ("[T]his circuit clearly and consistently has refused to recognize any defense based on … 'outrageous government conduct.'");

---

[6] Some defendants invoke this due process argument when they cannot satisfy the elements of a traditional entrapment defense. For instance, in *Russell*, entrapment was unavailable because the defendant conceded that he may have harbored a predisposition to commit the offense. 441 U.S. at 433. Similarly, in Conley's direct appeal, we rejected his ability to argue entrapment. Entrapment "applies only when a government actor recruits a defendant," yet Conley was recruited by private co-conspirators who themselves were recruited by Myreon Flowers, not police. *Conley*, 875 F.3d at 402.

*Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003) ("We flatly rejected the doctrine in *United States v. Boyd*, 55 F.3d 239, 241–42 (7th Cir. 1995).").

Second, even if the defense were available in theory, Conley procedurally defaulted it. "A claim cannot be raised for the first time in a § 2255 motion if it could have been raised at trial or on direct appeal," absent a showing of cause and prejudice, or actual innocence. *McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016), citing *Sandoval v. United States*, 574 F.3d 847, 850 (7th Cir. 2009). Conley did not raise the defense until this § 2255 motion, and the government argues that he has not shown cause for excusing the default. Conley, however, seeks to excuse his default on the grounds that (1) the basis for his claim did not exist when his direct appeal was pending, and (2) he tried to raise the argument but his lawyer decided against it.

As to the first argument, "a showing that the factual or legal basis for a claim was not reasonably available to counsel … would constitute cause" for excusing procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986), citing *Reed v. Ross*, 468 U.S. 1, 16 (1984). But Conley's outrageous conduct defense is not a newly available legal theory. Even in the face of our "uniform wall of precedent" rejecting the defense, Conley still needed to raise it to preserve it for potential reconsideration here. See, e.g., *Greer v. United States*, 141 S. Ct. 2090, 2099 (2021) (unpreserved claim is subject to plain-error review under Federal Rule of Criminal Procedure 52 even if precedent foreclosed the claim at the time the defendant could have objected). Perhaps recognizing this problem, Conley instead says that the factual basis for his claim was unavailable on direct appeal because the Fagan Report had not yet been

published. We understand Conley's outrageousness argument, however, to rest primarily on the nature of fake stash house stings as police-created traps, not on the Fagan Report's (disputed) finding that they were racially motivated.

We also reject Conley's second excuse for defaulting the claim—that he tried to raise it on direct appeal but was thwarted by his attorney's decision to advance other arguments instead. Attorneys have wide discretion to choose issues for appeal. Not raising an outrageous conduct defense made strategic sense given our repeated rejections. An outrageous conduct argument would certainly not have been "clearly stronger" than the arguments his lawyer raised. Cf. *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013) (applying ineffective-assistance-of-counsel standard to appellate counsel). Conley says we nonetheless have excused default in a case like his where the defendant did all he could to try to raise an issue. But that case is clearly distinguishable. In *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1044 (7th Cir. 2003), we excused procedural default where the petitioner had tried to raise the issue with his attorneys and courts for fifteen years, and his requests had been completely ignored—not rejected for a good strategic reason.

Third, even if we recognized the defense and could reach its merits, the sting here was not so outrageous as to violate due process. In the very rare cases where other courts have reversed convictions due to outrageous government conduct, law enforcement agencies were much more active in coaxing the defendants to commit their crimes. For example, in Conley's best supporting case, *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), the Third Circuit found outrageous conduct where the DEA "involve[d] itself so directly and continuously

over such a long period of time in the creation and mainte-nance of criminal operations." *Id.* at 379. The DEA not only purchased most of the supplies for a methamphetamine lab, but the government informant provided all the expertise and led the actual process of producing meth in the lab. *Id.* at 380–81. All of Twigg's actions were at the specific direction of the government informant; Twigg did not provide any expertise, supplies, or ideas himself. Moreover, the DEA even supplied the location for the lab after the defendants were having diffi-culty finding a place. The agents were thus actively solving problems and holding the defendants' hands at every step.

Here, by contrast, the ATF proposed a fake crime and stood back and watched as Myreon Flowers quickly gathered a crew, developed a plan, and showed up ready to execute an armed robbery. Like Twigg, Conley was recruited by another defendant. But unlike Twigg, Conley was an active partici-pant who contributed to the planning process and agreed to a frontline (i.e., armed) role. Conley was not coaxed along by government agents at every turn. His case simply does not exhibit the sort of constant police nudging that outraged the court in *Twigg*.

Rather, Conley's sting closely resembles the ATF sting we upheld in *United States v. Smith*, 792 F.3d 760 (7th Cir. 2015), in which an undercover ATF agent arranged for the defendant to provide armed security for the transport of cocaine. On ap-peal, the defendant argued that the sting constituted outra-geous government conduct. We disagreed: "when an individ-ual is ready and willing to engage in illegal activity, the fact that the Government affords him an opportunity to commit the crime provides no legal impediment to prosecution." *Id.* at 766. That is all the ATF did in Conley's case. It presented a

criminal opportunity, which Conley freely accepted when other conspirators asked him to join the team.

Even assuming some police tactics could be so outrageous as to violate due process, such a defense could not simply "give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it d[oes] not approve. The execution of the federal laws under our Constitution is confided primarily to the Executive Branch…." *Russell*, 411 U.S. at 435. The ATF's conduct in Conley's case stopped short of "violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Id.* at 432, quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960).

Because Conley has failed to prove that the ATF violated his Fifth Amendment equal protection or due process rights, the district court's denial of relief under 28 U.S.C. § 2255 is

AFFIRMED.